Michael D. Braun (167416)
**BRAUN LAW GROUP, P.C.**
10680 W. Pico Blvd., Suite 280
Los Angeles, CA 90064
Tel:  (310) 836-6000
Fax:  (310) 836-6010
Email:  service@braunlawgroup.com

Joseph N. Kravec, Jr.(admitted *pro hac vice*)
Wyatt A. Lison (admitted *pro hac vice*)
**FEINSTEIN DOYLE PAYNE
  & KRAVEC, LLC**
429 Forbes Avenue
Allegheny Building, 17th Floor
Pittsburgh, PA 15219
Tel:  (412) 281-8400
Fax:  (412) 281-1007
Email:   jkravec@fdpklaw.com
        wlison@fdpklaw.com

Janet Lindner Spielberg (221926)
**LAW OFFICES OF JANET
  LINDNER SPIELBERG**
12400 Wilshire Boulevard, Suite 400
Los Angeles, CA 90025
Tel:  (310) 392-8801
Fax:  (310) 278-5938
Email:  jlspielberg@jlslp.com

*ATTORNEYS FOR PLAINTIFF*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| SKYE ASTIANA  on behalf of herself and all others similarly situated, <br><br>                    Plaintiff, <br><br>          v. <br><br> BEN & JERRY'S HOMEMADE, INC., <br><br>                    Defendant. | CASE NO.:  10-cv-04387-PJH <br><br> <u>CLASS ACTION</u> <br><br> **NOTICE MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Date:     October 30, 2013 <br> Time:     9:00 a.m. <br> Ctrm:    3, 3rd Floor |

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT .......................................2

I.   INTRODUCTION ...................................................................................................................2

II.  COMMON EVIDENCE ADDUCED TO DATE....................................................................4

   A.  B&J Used Common Labels And Common Misrepresentations On Its Labels
      Throughout The Class Period ..........................................................................................4

   B.  Throughout The Class Period, B&J Used The Common Ingredient Of Alkalized
      Cocoa Processed With a Non-Natural, Man Made, Synthetic Ingredient In Its B&J
      Ice Cream Products .........................................................................................................5

   C.  Common Evidence Establishes That "All Natural" Signifies The Absence Of
      Ingredients Processed With Synthetic Chemicals, Particularly Given The Federal
      Regulatory Standard Specifically Applicable To Ice Cream Flavors .............................7

   D.  B&J's "All Natural" Claims Were Material To Purchasers' Decision to Buy B&J
      Ice Cream Products .......................................................................................................10

   E.  Plaintiff Purchased A Number Of B&J Ice Cream Products .........................................11

   F.  Class-wide Relief Can Be Proved On A Common Basis ...............................................13

III. THE REQUIREMENTS FOR CERTIFICATION PURSUANT TO FED.R.CIV.P. 23(a)
    AND 23(b)(3) ARE MET .......................................................................................................13

   A.  Standard .........................................................................................................................13

   B.  Rule 23(a)(1) – Numerosity ..........................................................................................14

   C.  Rule 23(a)(3) – Typicality .............................................................................................14

   D.  Rule 23(a)(4) – Adequacy of Representation ................................................................16

   E.  Rule 23(a)(2) Commonality / Rule 23(b)(3) Predominance .........................................17

      1.  Common Questions Exist for Plaintiffs and the Class........................................17

      2.  Common Questions of Law Predominate As To Plaintiff's Consumer Protection
         Claims ..................................................................................................................18

      3.  Common Questions of Law Predominate As To Plaintiff's Common Law Fraud
         and Quasi Contract Claims ..................................................................................20

      4.  Individual Issues of Damages Do Not Predominate ...........................................21

   F.  Rule 23(b)(3) – Superiority............................................................................................23

      1.  Rule 23(b)(3)(A) ................................................................................................24

2.   Rule 23(b)(3)(B) ....................................................................................24

3.   Rule 23(b)(3)(C) ....................................................................................24

4.   Rule 23(b)(3)(D) ....................................................................................25

IV. CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................ 17

*Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766 (N.D.Cal. July 20, 2012) ............ passim

*Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 4892391 (N.D. Cal. Oct. 12, 2012) ................... 9

*Astiana v. Kashi Co.*, --- F.R.D. ----, 2013 WL 3943265 (S.D.Cal. July 30, 2013) ........................ passim

*Barbosa v. Cargill Meat Solutions Corp.*, 2013 WL 3340939 (E.D.Cal. July 2, 2013) ........................ 21

*Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558 (S.D. Cal. 2012) ................................................. 3, 15, 16

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) ...................................................................... 21

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ...................................... 24, 25

*Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365 (N.D.Cal 2010) .................................. passim

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  68 Cal. App. 4th 445, 80 Cal. Rptr. 2d 329 (1998) ................................................................ 20

*Colucci, et al. v. ZonePerfect Nutrition Co.*,
  No. 12–2907–SC, 2012 WL 6737800 (N.D.Cal. Dec. 28, 2012) ........................................ 12

*Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) ...........................................................21, 22, 23

*Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978) ................................................................ 14

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir.2011) ................................................... 14

*Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal. App. 4th 1388 (Cal. Ct. App. 2002) .................................. 19

*Gaudin v. Saxon Mortgage Services, Inc.*, 2013 WL 4029043 (N.D.Cal., Aug. 5, 2013) ...................... 21

*Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330 (9th Cir.1977) ........................................ 14

*Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ..................................................................... 14, 16

*Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468 (C.D. Cal. 2012) ................................................... 21

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........................................... 14, 16, 17

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir.1992) .......................................................... 14

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir.1964) ...................................... 14

*Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161 (7th Cir. 1974) .......................................... 25

*In re Emulex Corp.*, 210 F.R.D. 717 (C.D. Cal. 2002) ................................................................ 17

*In re Ferrero*, 278 F.R.D. 552 (S.D. Cal. 2011) ......................................................... 3, 16, 18

*In re POM Wonderful*, 2012 WL 4490860 (C.D.Cal. 2012) ........................................... 3, 18

*In re Tobacco II Cases*, 46 Cal.4th 298 (Cal. 2009) ........................................................ 19

*In re Worldcom Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003)................................... 24

*Info. Res., Inc. v. Dun & Bradstreet Corp.*, 294 F.3d 447 (2d Cir. 2002) ........................... 22

*Johns v. Bayer Corp.*, 280 F.R.D. 551 (S.D.Cal., 2012)........................................ 3, 15, 18, 21

*Johnson v. General Mills, Inc.*, 276 F.R.D. 519 (C.D.Cal.2011) .................................... 3, 18

*Jordan v. Paul Financial, LLC*, 285 F.R.D. 435 (N.D.Cal. 2012) .................................. 25

*Koh v. S.C. Johnson & Son, Inc.*, 2010 WL 94265 (N.D. Cal. Jan. 6, 2010) ...................... 12

*Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011) ........................................ 10

*Leyva v. Medline Industries Inc.*, 716 F.3d 510 (9th Cir. 2013) ................................... 21

*McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457 (2006) ................................. 20

*Morgan v. U.S.*, 298 U.S. 468 (1936) ...................................................................... 6

*Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735 (Cal. Ct. App. 1980) ................... 19

*Pacific States Box & Basket Co. v. White*, 296 U.S. 176 (1935) ................................... 6

*Parra v. Bashas', Inc.*, --- F.R.D. ----, 2013 WL 2407204 (D.Ariz. May 31, 2013) ............ 21

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985)........................................ 24

*Rodriguez v. Hayes,* 591 F.3d 1105 (9th Cir.2010) ............................................. 14, 17

*Rogge v. U. S.*, 128 F.2d 800 (9th Cir. 1942)................................................................ 6

*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (Cal. Ct. App. 1999) ... 18, 19

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir.2003) ................................................ 16

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011)................................... 19

*Thurston v. Bear Naked, Inc.*, No. 3:11-CV-02890 (S.D.Cal. July 30, 2013) ............ 2, 13, 16, 23

*Tobin v. Conopco, Inc. et al.*, 12-cv-5881-JSW (N.D.Ca.)........................................... 24

*Vasquez v. Superior Court*, 4 Cal. 3d 800, 484 P.2d 964 (1971)................................... 20

*Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011)........................................ 13, 17, 18

*West v. Circle K Stores, Inc.*, 2006 WL 1652598 (E.D. Cal. June 12, 2006) ...................... 24

*Williams v. Gerber Prods.*, 552 F.3d 934 (9th Cir. 2008) ......................................... 19

*Zeisel v. Diamond Foods*, Inc., 2011 WL 2221113 (N.D.Cal., 2011) ................................... passim

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir.2001) .................................... 13

**STATUTES**

21 U.S.C. § 343(a)(1) ................................................................................................................. 18

Business & Professions Code § 17500 ............................................................................ 3, 18, 19

Cal. Health & Safety Code § 110100(a) .................................................................................... 19

Cal. Health & Safety Code § 110660 ......................................................................................... 19

Cal. Health & Safety Code §§ 109875-111915 ........................................................................... 3

California Business & Professions Code § 17200 ............................................................. 3, 18, 19

**RULES**

Fed. R. Civ. P. 23(a) ............................................................................................................ passim

Fed.R.Civ.P. 23(b) ............................................................................................................... passim

Fed. R. Civ. P. 23(g) ................................................................................................................ 4, 16

**REGULATIONS**

21 C.F.R. § 101.22(i) ........................................................................................................... 2, 4, 8

21 C.F.R. § 135.110(f) ............................................................................................................. 7, 15

21 C.F.R. § 135.110(f)(2) ............................................................................................... 1, 2, 4, 7, 18

21 C.F.R. § 163.110 ...................................................................................................................... 9

21 C.F.R. §163.112 ....................................................................................................................... 9

7 C.F.R. § 205.605(a) ............................................................................................................ 6, 9, 15

7 C.F.R. § 205.605(b) ................................................................................................................. 5, 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

TO DEFENDANT AND ITS ATTORNEYS OF RECORDS:

PLEASE TAKE NOTICE that, on October 30, 2013, at 9:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Judge Phyllis J. Hamilton, United States District Court Judge for the Northern District of California, 1301 Clay Street, Courtroom 3, Oakland, CA 94612, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3), Plaintiff Skye Astiana will and hereby does move this Court to certify her claims against Defendant Ben & Jerry's Homemade, Inc., based upon its false and misleading labeling of certain of its ice cream products as "All Natural" and in violation of 21 C.F.R. § 135.110(f)(2), when those ice cream products contain alkalized cocoa processed with a synthetic ingredient; to appoint Plaintiff Astiana as class representative; and to appoint the following attorneys as Class Counsel:  Joseph N. Kravec, Jr. of Feinstein Doyle Payne & Kravec, LLC, Michael D. Braun of the Braun Law Group, P.C., and Janet Lindner Spielberg of the Law Offices of Janet Lindner Spielberg.

Plaintiff moves this Court to certify her claims on behalf of a Class defined as:

> All persons who, on or after September 29, 2006, purchased in the State of California Ben & Jerry's ice cream products that were labeled "All Natural" but contained alkalized cocoa processed with a synthetic ingredient.

Excluded from the Class are: (i) all retailers, wholesalers and distributors who purchased a B&J Ice Cream product for resale; (ii) Defendant and its employees, principals, affiliated entities, legal representatives, successors and assigns; (iii) any person who files a valid, timely request for exclusion; and (iv) the judges to whom this action is assigned and any members of their immediate families.

The proposed Class is certifiable under Fed.R.Civ.P. 23(a) and 23(b)(3), as Plaintiff's and the Class's claims are based upon Defendant's standardized misconduct in falsely and misleadingly labeling its ice cream products in violation of the Federal Food Drug and Cosmetic Act, as amended, and California law.

The Motion is based on this Notice of Motion and Motion, the accompanying Memorandum and Points of Authorities in Support of Motion for Class Certification, the Proposed Order, the files and records in this case, and such argument and further filings and evidence as this Court may receive on this Motion.

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

## I. INTRODUCTION

Plaintiff Skye Astiana respectfully submits this memorandum of points and authorities in support of her motion for class certification, appointment of class representatives, and appointment of class counsel ("Class Motion"). Plaintiff seeks state-wide certification of her claims in this class action against Defendant Ben & Jerry's Homemade, Inc. ("Defendant" or "B&J"), on behalf of herself and a Class defined as: "All persons who, on or after September 29, 2006, purchased in the State of California Ben & Jerry's ice cream products that were labeled 'all natural' but contained non-natural alkalized cocoa processed with a synthetic ingredient."[1,2] Plaintiff was harmed by this false and misleading labeling because she purchased B&J Ice Cream Products in the belief that the ingredients in them were "All Natural" as the labels represented but, unbeknownst to her at the time, she did not receive the "All Natural" products that she paid for. ¶ 5.

As further explained below, during the motion to dismiss stage the Court and the parties debated about whether there was a clear standard for labeling ice cream as "natural," and what that standard was. Further research by Plaintiff discovered there is a clear standard with regards to flavoring ingredients in ice cream such as cocoa or chocolate found in federal regulations. *See* 21 C.F.R. §§ 101.22(i) (addressing characterizing flavors of foods) and 135.110(f)(2) (addressing labeling of ice cream). As Judge Chen of this Court found in relation to another "all natural" ice cream labeling action, pursuant to the FDA's ice cream labeling and flavor regulation, if a food contains *any* artificial flavor that simulates, resembles, or reinforces the characterizing flavor, the food must be labeled "artificially flavored." *See Astiana v. Dreyer's Grand Ice Cream, Inc.,* 2012 WL 2990766, at *6 (N.D.Cal. July 20, 2012). B&J violated the clear regulatory standard embodied in Sections 135.11(f)(2) and 101.22(i) by failing to label its ice cream that contained artificially-flavored chocolate "artificially flavored," and instead misleadingly labeled the products, including all of the products' flavor

---

[1] All "¶" references are to Plaintiffs' First Amended Complaint for Damages, Equitable, Declaratory and Injunctive Relief (Dkt. #20) ("FAC").

[2] The B&J ice cream products at issue ("B&J Ice Cream Products"), which include flavors of ice cream and frozen yogurt, as well as novelty products, are listed at ¶ 20. The corresponding "All Natural" labels are at Exhibit 1 to the Declaration of Joseph N. Kravec, Jr. ("Kravec Decl.") filed herewith.

ingredients, as being "All Natural."

Through the use of this false and misleading labeling and its violation of the regulatory standard, B&J was able to sell its falsely labeled Ice Cream Products to thousands of unsuspecting consumers in California.   ¶ 2.  Plaintiff alleges that B&J's false and misleading conduct constitutes common law fraud and violates California Business & Professions Code § 17200 (one claim under the "unlawful" prong – based on violation of California's Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code §§ 109875-111915, which incorporates all relevant regulations of the federal Food and Drug Administration ("FDA"); one claim under the "unfair" prong; and one under the "fraudulent" prong).  Plaintiff also alleges a claim of false advertising under Business & Professions Code § 17500; and a claim for restitution on quasi-contract based on a theory of unjust enrichment.

Courts within this Circuit routinely certify litigation classes for similar food and other product mislabeling claims.  *See, e.g.*, *Astiana v. Kashi Co.*, --- F.R.D. ----, 2013 WL 3943265 (S.D.Cal. July 30, 2013)(certifying an "All Natural" mislabeling claim); *Thurston v. Bear Naked, Inc.*, No. 3:11-CV-02890 (S.D.Cal. July 30, 2013) (Kravec Decl. Ex. 2 )(certifying a "100% Natural" labeling claim); *In re POM Wonderful*, 2012 WL 4490860, *1 (C.D.Cal. 2012); *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 564 (S.D.Cal. 2012); *Johns v. Bayer Corp.*, 280 F.R.D. 551, 559 (S.D.Cal. 2012); *In re Ferrero*, 278 F.R.D. 552, 556 (S.D.Cal. 2011); *Johnson v. General Mills, Inc.*, 276 F.R.D. 519, 521 (C.D.Cal.2011); *Zeisel v. Diamond Foods*, Inc., 2011 WL 2221113, *1 (N.D.Cal. 2011); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 369 (N.D.Cal. 2010).  This case is no different.  The predominately common evidence adduced in this case shows why these product mislabeling cases are routinely certified, and why this case too should be certified.

While fact discovery is ongoing, evidence adduced to date demonstrates that class members' claims all arise from B&J's uniform course of conduct in violating a clear regulatory standard, and that all the factual issues necessary to resolve Plaintiff's and class members' dispute with B&J are common issues that can be proven on a class-wide basis through documents, testimony of key corporate personnel, and expert testimony.  Specifically, the evidence adduced thus far shows that throughout the class period: 1) the B&J Ice Cream Products had common labels containing common "All Natural"

1   misrepresentations;  2) labeling of the B&J Ice Cream Products commonly violated FDA regulations 21

2   C.F.R. §§ 135.110(f)(2) and 101.22(i) by labeling its products "All Natural" instead of "artificial" or

3   "artificially flavored" suggesting the products contained no non-natural flavors; 3) the B&J Ice Cream

4   Products all commonly were made with non-natural alkalized cocoa processed with a synthetic

5   ingredient; 4) the B&J Ice Cream Products' "All Natural" claim on its labels signifies to consumers the

6   absence of processing with a synthetic ingredient; 5) Plaintiff purchased B&J Ice Cream Products based

7   on materially identical "All Natural" labels; and 6) the restitution and restitutionary disgorgement relief

8   sought for Plaintiff's class claims can be determined through available records of units sold, revenue,

9   costs, profits and average retail prices.

10         As further detailed below, this predominantly common evidence shows that Plaintiff has met all

11  of the requirements of Rule 23(a) and 23(b)(3).  Therefore, Plaintiff respectfully requests that this Court

12  certify the proposed Class, appoint Plaintiff as Class Representative for the Class, and appoint

13  Plaintiffs' Counsel[3] as Class Counsel for the Class pursuant to Fed.R.Civ.P. 23(g)(1).

14  **II.     COMMON EVIDENCE ADDUCED TO DATE**

15         **A.     B&J Used Common Labels And Common Misrepresentations On Its Labels
16                  Throughout The Class Period**

17         Discovery to date establishes that B&J used common, materially identical labels with the

18  identical "All Natural" statement incorporated into its products' trademarks on the front and lid of each

19  of the B&J Ice Cream Products.[4]  *See* Kravec Decl. Ex. 1 (Labels); Kravec Decl. Ex. 6 (Fed.R.Civ.P.

20  30(b)(6) Deposition of Ben & Jerry's through Michael Graning) ("B&J Dep.") at 5:12-25 – 6:1-6,

21  11:11-14; Kravec Decl. Ex. 7 (Stipulation for Class Certification)("Stipulation") at ¶ 14; B&J Answer

22  ("Answer") (Dkt. No. 63) at ¶¶ 2, 19.  The same "All Natural" statement was made on all of the B&J

23  Ice Cream Products' labels until B&J removed it in four waves beginning in September of 2010 and

24  ending in September of 2011.  Stipulation at ¶ 16.

25  _____

26  [3] Plaintiff moves for appointment of Joseph N. Kravec, Jr. of Feinstein Doyle Payne & Kravec, LLC,
    Michael D. Braun of the Braun Law Group, P.C., and Janet Lindner Spielberg of the Law Offices of
27  Janet Lindner Spielberg, as Class Counsel.  Resumes for proposed Class Counsel are submitted
    herewith as Exhibits 3-5 to the Kravec Declaration.

28  [4] The class period runs from September 29, 2006, *i.e.*, four years prior to the filing of this case.  *See*

**B.    Throughout The Class Period, B&J Used The Common Ingredient Of Alkalized Cocoa Processed With a Non-Natural, Man Made, Synthetic Ingredient In Its B&J Ice Cream Products**

B&J sold and marketed a number of Ice Cream Products that bore the label "All Natural" that contain alkalized cocoa.[5]  *See* Kravec Decl. Ex. 1 (Labels); Answer ¶ 2, 19; B&J Dep, at 13:11-14.  As established below, discovery has confirmed that the alkalized cocoa used in the B&J Ice Cream Products is not natural, and is processed with an unnatural alkalizing agent, primarily potassium carbonate.

As B&J's cocoa supplier, Barry Callebaut, confirmed, in the cocoa industry, natural cocoa is never alkalized.   Kravec Decl. Ex. 9 (Deposition of Barry Callebaut through Ben DeShryver ("DeSchryver Dep.") at 31:9-22.   Significantly, B&J's parent, Unilever's Senior Manager of Regulatory Affairs, acknowledges, "

REDACTED

"  Kravec Decl. Ex. 8.[6]  This is true regardless of which alkalizing agent is used for the cocoa.  DeShryver Dep. at 56:7-13.

Moreover, common evidence shows that B&J used alkalized cocoa processed with a non-natural ingredient, primarily potassium carbonate, when natural processing aids were available.  Under federal regulations, potassium carbonate is a recognized synthetic substance.  7 C.F.R. § 205.605(b).  The B&J Ice Cream Products use alkalized cocoa processed with potassium carbonate primarily as well as a combination of sodium hydroxide and ammonium bicarbonate which are all synthetic substances. DeSchryver Dep. at 20:16-22; 7 C.F.R. § 205.605(b) (listing potassium carbonate, sodium hydroxide and ammonium bicarbonate as synthetic ingredients)   This is true even though alkalized cocoa can be

---

Dkt. No. 1.

[5]  The Court aptly summarized the pertinent background with respect to alkalized cocoa in its ruling denying B&J's motion to dismiss.  Dkt. No. 62.

[6] The email was drafted by Samuel Zeller who identifies himself on his LinkedIn account as Unilever Bestfoods Sr. Mngr Regulatory Affairs since January, 2010. http://www.linkedin.com/profile/view?id=53983718&authType=NAME_SEARCH&authToken=Faww &locale=en_US&srchid=73142294138004026 8538&srchindex=1&srchtotal=21&trk=vsrp_people_res _name&trkInfo=VSRPsearchId%3A73142294138004026 8538%2CVSRPtargetId%3A53983718%2CV SRPcmpt%3Aprimary (last accessed September 24, 2013).

1  and commonly is processed with an ingredient which federal regulations identify as natural, sodium

2  carbonate.  Kravec Decl. Ex. 10 (email from Barry Callebaut to B&J stating, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3  ▮▮▮▮▮▮▮▮▮▮▮▮▮REDACTED▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮");  7 C.F.R. §

4  205.605(a)(identifying sodium carbonate as a natural substance).

5           The federal regulations which establish that the potassium carbonate and other ingredients used

6  to alkalize the cocoa in the B&J Ice Cream Products are synthetic in fact determine the nature of

7  various substances and constitute regulatory findings of fact, creating a strong evidentiary presumption

8  in Plaintiff's favor that these substances are synthetic.  *See Morgan v. U.S.*, 298 U.S. 468, 477 (1936)

9  ("When the Secretary acts within the authority conferred by the statute, his findings of fact are

10  conclusive."); *Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 185-86 (1935); *Rogge v. U. S.*,

11  128 F.2d 800, 803 (9th Cir. 1942).

12           Discovery from B&J and its alkalized cocoa supplier confirms that the manufacturer of the

13  alkalized cocoa powder used in the B&J Ice Cream Products primarily utilized potassium carbonate as

14  the alkalizing agent.[7]  B&J's lone alkalized cocoa supplier for the B&J Ice Cream Products that had a

15  chocolate base (i.e., when the alkalized cocoa was a primary ingredient and not a sub-ingredient within

16  a mix-in) was Barry Callebaut.  B&J Dep. at 20:5-14; Stipulation, ¶ 12.  Unilever's suppliers, including

17  its cocoa suppliers, are required to adhere to Unilever's[8] specifications for any ingredient that goes into

18  B&J Ice Cream Products.  B&J Dep. at 20:25-21:9.  B&J never specified what alkalizing agent was to

19  be used to make the alkalized cocoa used in the B&J Ice Cream products.  *Id.* at 21:10-18; DeSchryver

20

21  ─────────────────

    [7] B&J does not know the alkalizing agent used to make the chocolate mix-ins, but internal spreadsheets
22  suggest potassium carbonate was the alkalizing agent used in all of the alkalized cocoa in these
    ingredients.  *See* Kravec Decl. Ex. 14 .  Indeed, at least one supplier of a chocolate mix-in identifies the
23  alkalizing agent as potassium carbonate.  Kravec Dec. Ex. 12.  Moreover, Barry Callebaut testified that
    at least some of its non-organic chocolate mix-ins used by B&J, are made using soy lecithin processed
24  with hexane (DeSchryver Dep. at 71:9-17) and many of the B&J Ice Cream Products were made with
    ingredients containing soy lecithin.  Kravec Decl. Ex. 11.  Plaintiff has not deposed all of the mix-in
25  manufacturers, but anticipates that discovery of these companies will show both the alkalizing agent
    used in the products as well as whether they included hexane processed soy.  Stipulation ¶13.  If this
26  discovery reveals that all of the chocolate mix-ins were manufactured using hexane-processed soy
    lecithin, Plaintiff reserves the right to amend her complaint to conform to this newly-discovered
27  evidence.  *See Kashi Co.*, 2013 WL 3943265 (certifying an "All Natural" mislabeling claim due to the
    inclusion of hexane processed soy).

28  [8] B&J is a subsidiary of Unilever.  Answer ¶ 7.

Dep. at 99:3-10.  Without guidance from B&J or Unilever, Barry Callebaut primarily used potassium carbonate and, must less frequently, a combination of sodium hydroxide and ammonium bicarbonate, all of which the federal regulation cited above identify as synthetic.  Kravec Decl. Ex. 13.  Importantly, B&J never specified which alkalizing agent its suppliers should use (B&J Dep. p. 21:14-24), but could have requested a natural alkalizing agent be used.  *Id.*; DeSchryver Dep. at 103:19-104:6.

### C.   Common Evidence Establishes That "All Natural" Signifies The Absence Of Ingredients Processed With Synthetic Chemicals, Particularly Given The Federal Regulatory Standard Specifically Applicable To Ice Cream Flavors

Available common evidence establishes that foods that use alkalized cocoa processed with a synthetic substance are not "All Natural."

As shown, the cocoa used in the B&J Ice Cream Products was alkalized with potassium carbonate or sodium hydroxide and ammonium bicarbonate, and federal regulations recognize these as synthetic substances.  7 C.F.R. § 205.605(b).  If this were not enough, FDA regulations mandate that if the characterizing flavor or a simulating flavor in ice cream is artificial, the label must identify the ice cream as either "artificially flavored" or "flavored" as specified in 21 C.F.R. § 135.110(f).[9]  This

---

[9] Section 135.110(f)(2) provides:

(i) If the food contains no artificial flavor, the name on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., "vanilla," in letters not less than one-half the height of the letters used in the words "ice cream."

(ii) If the food contains both a natural characterizing flavor and an artificial flavor simulating it, and if the natural flavor predominates, the name on the principal display panel or panels of the label shall be accompanied by the common name of the characterizing flavor, in letters not less than one-half the height of the letters used in the words "ice cream," followed by the word "flavored," in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "Vanilla flavored," or "Peach flavored," or "Vanilla flavored and Strawberry flavored."

(iii) If the food contains both a natural characterizing flavor and an artificial flavor simulating it, and if the artificial flavor predominates, or if artificial flavor is used alone the name on the principal display panel or panels of the label shall be accompanied by the common name of the characterizing0 flavor in letters not less than one-half the height of the letters used in the words "ice cream," preceded by "artificial" or "artificially flavored," in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "artificial Vanilla," or "artificially flavored Strawberry" or "artificially flavored Vanilla and artificially flavored Strawberry."

regulation places an affirmative duty on the manufacturer to appropriately label the product if it contains any artificial flavor, and does not permit the characterizing flavor of ice cream to be called "natural" or "all natural" when it is not. *Id.* B&J did not label the Ice Cream Products "artificially flavored" or "flavored" as required by the federal regulations, but instead labeled those Products as "All Natural." By labeling its Ice Cream Products as "All Natural," B&J represents every ingredient in the product, including the ingredient comprising the chocolate flavor, i.e., the cocoa processed with alkali, is natural, when it is not because the cocoa was alkalized with potassium carbonate, which is recognized by federal regulation as synthetic, and is not natural cocoa which is never alkalized. DeSchryver Dep. at 31:9-32:2 (in the cocoa industry, natural cocoa is cocoa that is not processed with an alkali); Kravec Decl. Ex. 14 (Barry Callebaut brochure showing the characteristics of natural and alkalized cocoa); DeSchryver Dep. at 87:21-90:10 (the only difference between natural cocoa and alkalized cocoa is the use of an alkalizing agent, which results in alkalized cocoa as not having all natural ingredients and having added flavors).

Further 21 C.F.R. § 101.22(i) provides with regard to characterizing flavors generally (not just with regard to ice cream):

> (i)   If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor and shall be declared in the following way:
>
> (1)   If the food contains no artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., "vanilla," in letters not less than one-half the height of the letters used in the name of the food [with certain exceptions] ....
>
> (2)   If the food contains any artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name(s) of the characterizing flavor, in letters not less than one-half the height of the letters used in the name of the food and the name of the characterizing flavor shall be accompanied by the word(s) "artificial" or "artificially flavored," in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "artificial vanilla", "artificially flavored strawberry," or "grape artificially flavored."

Under Section 101.22(i), if a food contains *any* artificial flavor that simulates, resembles, or reinforces

the characterizing flavor, the food must be labeled "artificially flavored."  *See Astiana v. Dreyer's Grand Ice Cream, Inc.,* 2012 WL 2990766, at *6 (N.D.Cal. July 20, 2012) (citing FDA advisory opinion to this effect).

Moreover, it is well recognized that alkalized cocoa can be alkalized with natural alkali such as sodium bicarbonate (21 C.F.R. §§ 163.110 – 163.112; Exhibit 10), which is recognized as a natural substance.  7 C.F.R. § 205.605(a).  Particularly because alkalized cocoa can be alkalized with a natural alkalizing agent, a reasonable consumer would have no reason to expect that a product labeled "All Natural" would be processed using a synthetic alkalizing agent.  More broadly, given that there is a specific regulation governing ice cream requiring B&J to disclose if a flavor is not natural, where the ice cream does not state that the product is "artificially flavored" or "artificial," and also states that the entire product is "All Natural," a reasonable consumer would expect that the entire product is made with all natural ingredients, including any flavoring or processing ingredients.

The application of these regulations and the clear standard they embody to ice cream labeled "All Natural" but using alkalized cocoa processed with synthetic potassium carbonate is discussed at length in Judge Chen's ruling in *Astiana v. Dreyer's Grand Ice Cream, Inc.,* 2012 WL 2990766, and also in his ruling denying the defendant's motion to certify appeal, at 2012 WL 4892391 (N.D. Cal. Oct. 12, 2012).  In the first ruling, the court denied the defendant ice cream maker's motion to dismiss and rejected the argument that **materiality** and **reliance** were not established as to the named plaintiff, explaining that even if that plaintiff "knew that potassium carbonate was an artificial ingredient, the Dreyer's/Edy's label did not identify that the agent used to alkalize the cocoa was potassium carbonate." 2012 WL 2990766, at *7.  Further, the court explained with relation to the defendant's Haagen-Daz ice cream that was labeled "All Natural" despite using cocoa alkalized with potassium carbonate, "to the extent DGIC argues that it is not required to identify whether a natural or synthetic process was used so long as it identified the ingredient, that argument is not persuasive." *Id.*  The court reasoned:

> According to DGIC, because potassium carbonate is commonly used as an alkalizing agent—as Plaintiffs admit in their complaint—nothing artificial or synthetic has been used in its ice cream. This position is problematic because, even if potassium carbonate is commonly used, that does not necessarily mean that a reasonable consumer would expect it to be used— *i.e.,* normally used does not necessarily imply normally expected; a reasonable consumer may not have the same knowledge as, *e.g.,* a commercial manufacturer. Even if a reasonable consumer might have some knowledge about

alkalizing agents, Plaintiffs have alleged that not only is potassium carbonate commonly used as an alkalizing agent but so too is sodium carbonate, which is not artificial or synthetic.

*Id.* at *11.

The *Dreyer's* analysis is exactly on point here: a reasonable consumer simply would not expect an ice cream maker that labels its product as "all natural" to use an artificial or synthetic alkalizing agent, particularly where an alkalizing agent that is not artificial or synthetic is commonly available.

**D.    B&J's "All Natural" Claims Were Material To Purchasers' Decision to Buy B&J Ice Cream Products**

As the California Supreme Court recognized, "[t]he marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 889 (Cal. 2011).   Consistent with this premise, common evidence produced to date from B&J's records is more than sufficient to prove its "All Natural" claim placed on the front of each of the B&J Ice Cream Products is material.[10]

Between 2008 and 2010, B&J's parent, Unilever, worked to create a "Natural Claims Guideline" for its food products.  *See, e.g.*, Kravec Decl. Ex. 15.  According to Unilever's Natural Claims Guideline, " REDACTED . *Id.* at B&J00013735.   Thus, according to Unilever, REDACTED *Id.* at B&J00013736.

That "natural" food is important to consumers is supported by Unilever's and B&J's marketing studies and reports.  For example, a 2007 B&J leading concepts presentation, REDACTED Kravec Dec. Ex. 16 at 21, 25.  In a 2008 Unilever presentation,

---

[10] The materiality of B&J's "All Natural" statement is nothing new.  B&J first started advertising its ice cream as being "All Natural" when it opened its first scoop shop in the 1970s, and was always somewhere on the packaging of the products until it began removing the claim in 2010.  B&J Dep., pp. 13:15-14:14.  Indeed, it is still B&J's mission "[t]o make, distribute and sell the finest quality all natural ice cream…with a continued commitment to incorporating wholesome, natural ingredients." *See* http://www.benjerry.com/activism/mission-statement (last accessed September 24, 2013).

1   REDACTED

2   Kravec Decl. Ex. 17 at

3   B&J00037252.  In a 2009 ice-cream specific study conducted by Unilever,

4   REDACTED   Kravec Decl. Ex. 18 at B&J00037292.

5   B&J's internal studies are consistent with common evidence that consumers generally are

6   motivated by "all natural" claims.  Commercial marketing studies are similarly replete with evidence of

7   the materiality of "All Natural" claims to purchasers.  A 2010 Mintel study  reported that 75% of 25-34

8   year-olds, 74% of 18-24 year-olds, and 55% of 55-64 year-olds, are either very or somewhat interested

9   in consuming all natural foods, that more than 6 in 10 users of natural/organic products "agree that it's

10  worth paying more for natural products," and that "demand for all-natural products is high among

11  young adults and will remain relatively strong in years to come, as these young people mature, start

12  families, and gain greater influence."  Kravec Decl. Ex. 27 at 52.  Indeed, according to The Nielsen

13  Company that tracks sales of products nationwide, sales of food products with "natural" claims exceed

14  $20 billion dollars annually.  Kravec Dec. Ex. 19 at 3.

15  Numerous studies further show the materiality of "natural" label claims throughout the class

16  period.  In 2008, market research group Packaged Facts reported "[t]he overall trend is clear...[n]atural

17  and organic products are flying high in segments that are otherwise flat."  Kravec Decl. Ex. 20 at 3-5.

18  By 2009, "Natural" had become the most popular claim when launching new foods and beverages in

19  the United States.  Kravec Decl. Ex. 21 at 2.  A 2009 study reported 50% of consumers rated a

20  "Natural" claim on a food package as either "Very Important" or "Important."  Kravec Decl. Ex.  22 at

21  5.  In fact, as a 2011 study reports, 25% of consumers rated "100 percent natural" or "all natural" as

22  "the best description to read on a food label."  Kravec Decl. Ex. 23.  U.S. retail sales of natural and

23  organic food and beverages are expected to double from $39 billion in 2010 to $78 billion in 2015.

24  Kravec Decl. Ex. 24.  This follows a five-year sales increase of 63% from 2005 through 2010.  *Id.*

25  Common evidence from B&J and independent commercial market researchers shows that

26  marketing a product "All Natural" is material to consumers.

27  **E.**    **Plaintiff Purchased A Number Of B&J Ice Cream Products**

28

Plaintiff has purchased the following B&J Ice Cream Products: All Natural Froyo Chocolate Fudge Brownie Frozen Yogurt, All Natural Chocolate Fudge Brownie Ice Cream, Cherry Garcia, Chocolate, Chocolate Chip Cookie Dough, Chocolate Fudge Brownie, Chubby Hubby, Chunky Monkey, and New York Super Fudge Chunk.  FAC ¶ 5 and ¶ 5 n.2; *see also* Kravec Decl. Ex. 25, Deposition Transcript of Skye Astiana ("Astiana Dep.") at 19:1-14, 64:19-21.  Plaintiff purchased these products based on the "All Natural" labeling claim, and would not have purchased the products had she known they were not actually all natural.  *Id.* at 19:24-20:2, 20:23-21:6, 51:21-52:6, 118:17-24

It is generally well accepted that a plaintiff may represent a class consisting of individuals who have purchased products in the same product line as the particular product he or she purchased.[11]  *See, e.g, Chavez*, 268 F.R.D. at 380 (certifying claims of a class of purchasers of "any beverage bearing the Blue Sky mark or brand"); *Colucci, et al. v. ZonePerfect Nutrition Co.*, No. 12–2907–SC, 2012 WL 6737800, *4 (N.D.Cal. Dec. 28, 2012) (concluding plaintiffs who purchased one flavor of Zone nutrition bar could represent purchasers of all other Zone nutrition bar flavors); *Astiana v. Dreyers Grand Ice Cream, Inc.*, 2012 WL 2990766, *11 (N.D.Cal. July 20, 2012) (different flavors of ice cream); *Koh v. S.C. Johnson & Son, Inc.*, 2010 WL 94265, *3 (N.D. Cal. Jan. 6, 2010), (different types of detergents).  As explained by Judge Chen, in refusing to dismiss class allegations:

> Plaintiffs are challenging the same kind of food products ( i.e., ice cream) as well as the same labels for all of the products— i.e., "All Natural Flavors" for the Dreyer's/Edy's products and "All Natural Ice Cream" for the Haagen–Dazs products. That the different ice creams may ultimately have different ingredients is not dispositive as Plaintiffs are challenging the same basic mislabeling practice across different product flavors. Indeed, many of the ingredients are the same… Therefore, the Court rejects DGIC's argument that claims based on ice cream products not purchased by Plaintiffs should be dismissed from the case.

*Astiana*, 2012 WL 2990766, *13.

Plaintiff's claims here are sufficiently similar to those of all other members of the Class to support certification.

---

[11] In *Koh*, 2010 WL 94265, rejecting argument that the plaintiff could not bring claims for products in product lines he had not purchased, Judge Whyte noted that "there is no brightline rule that different product lines cannot be covered by a single class."  *Id.* at *3. However, the court need not reach this issue, as Plaintiffs here have purchased items in each of B&J's product lines for the Class.

**F.      Class-wide Relief Can Be Proved On A Common Basis**

Plaintiff is able to prove entitlement to relief on a common basis for the Class.

Plaintiff can establish restitution (from data of average retail prices, numbers of units sold), restitutionary disgorgement of profits (from data on B&J's sales and costs), and damages based on a price-premium theory (from data on average retail prices) on a common basis for the Class.  B&J's keeps the necessary records on sales, profits, and costs for the B&J Ice Cream Products from which Plaintiff will be able to prove this restitution and damages.  Stipulation, ¶¶ 2-3; *see also* Kravec Decl. Ex. 26 (example of the types of financial records maintained by B&J).  Further, if necessary, Plaintiff can calculate this restitution and damages based upon a combination of B&J's records, records obtained from B&J's distributors, wholesalers and/or retailers, and records maintained by third-party retail information collectors such as Nielsen.   The same type of financial and sales information was sufficient for plaintiffs to show they could calculate damages and/or restitution in three nearly-identical food labeling cases, and is sufficient to prove damages and restitution on a common basis here.  *See, e.g., Kashi Co.*, 2013 WL 3943265 at *11; Kravec Dec. Ex. 2 at 17; *Zeisel*, 2011 WL 2221113 at *10; *see also* Section III.E.4, *infra*, discussing the ability to calculate damages.

**III.      THE REQUIREMENTS FOR CERTIFICATION PURSUANT TO FED.R.CIV.P. 23(A) AND 23(B)(3) ARE MET**

**A.      Standard**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011). To qualify, the party seeking class certification must provide facts sufficient to satisfy the requirements of Federal Rules of Civil Procedure 23(a) and (b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.2001). Fed.R.Civ.P. 23(a) requires Plaintiff to demonstrate: (1) numerosity; (2) commonality of the factual and legal issues; (3) typicality of Plaintiffs claims and defenses to those of the class; and (4) adequacy of Plaintiffs and their counsel.  Fed.R.Civ.P. 23(b)(3) requires that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

The district court must conduct a rigorous analysis to determine whether Rule 23 has been satisfied. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).  It is a well-recognized precept that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (quotation citation omitted), and a court must consider the merits if they overlap with the Rule 23 requirements.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).

### B.       Rule 23(a)(1) – Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "Impracticability does not mean impossibility," rather the inquiry focuses on the difficulty or inconvenience of joining all members of class. *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–914 (9th Cir. 1964). In determining whether numerosity is satisfied, the Court may consider reasonable inferences drawn from the facts before it. *Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n. 5 (9th Cir. 1977).

Here, at minimum, the Class consists of thousands of consumers in California.  Stipulation, ¶ 6. B&J cannot dispute the numerosity of the proposed Class.

While the exact number of consumers is not currently knowable, the threshold minimum for establishing numerosity under Rule 23(a)(1) is clearly satisfied.  *See, e.g., Chavez*, 268 F.R.D. at 376 (inferring numerosity based on "allegation that Blue Sky sold over $20 million of product").

### C.       Rule 23(a)(3) – Typicality

Rule 23(a)(3) requires the representative party to have claims that are "typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *Rodriguez v. Hayes,* 591 F.3d 1105, 1124 (9th Cir. 2010) (citations omitted). The typicality requirement is "permissive and requires only that the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). However, "[c]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th

Cir.1992) (citations omitted).

In this case, Plaintiff's claims are clearly typical.  Plaintiff's and all class members' claims each arise from the same course of events – the sales of "All Natural" labeled B&J Ice Cream Products which contained alkalized cocoa processed with a synthetic substance.  Alkalized cocoa, by its very nature, is not natural.  DeShryver Dep. at 31:9-22.  Moreover, B&J could have alkalized the cocoa with a natural substance, sodium carbonate.  Kravec Decl. Ex. 10; 7 C.F.R. § 205.605(a)(identifying sodium carbonate as a natural substance).  Instead, B&J used cocoa alkalized with non-natural alkalizing agents including potassium carbonate, sodium hydroxide, and ammonium bicarbonate (Kravec Decl. Ex. 16) despite its ability to specify for the use of a natural alkalizing agent.  B&J Dep. at 21:14-24; DeSchryver Dep. at 103:19-104:6.  Moreover, B&J failed to call the ice cream "artificially flavored" or "flavored" as specified in 21 C.F.R. § 135.110(f) despite the addition of a non-natural primary flavoring ingredient (i.e., cocoa in chocolate ice cream and chocolate mix-ins), and instead labeled its Ice Cream Products as "All Natural."

 Plaintiff and Class members were also each exposed to the identical alleged misrepresentations on the packages, Kravec Decl. Ex. 1 (Labels); Stipulation, ¶ 14; B&J Dep. at 5:12-25 – 6:1-6, 11:11-14, and thus share the same interests in determining whether the B&J Ice Cream Products were deceptively labeled.  *See, e.g., Beck-Ellman*, 283 F.R.D. at 565; *Johns*, 280 F.R.D. at 557.

As recognized in *Beck-Ellman*, a plaintiff who purchases products within the same product line with the same labeling omissions (or claims) is "sufficiently similar" to, and can represent, all other class members within that product line.  283 F.R.D. at 566 (certifying claims on behalf of all models in "heating pad" product line where all "heating pads contain similar omission[s]"); *see also Chavez*, 268 F.R.D. at 378 (certifying claims; stating "Although plaintiff did not purchase each type of beverage carrying the misleading label, his claims are 'reasonably coextensive with those of absent members.'") (citation omitted).  As in *Beck-Ellman* and *Chavez*, Plaintiff's claims cover the same product lines, bear materially identical misrepresentations and, therefore, have claims that are "sufficiently similar" to those of all other class members.

In sum, Plaintiff's claims arise from the same course of events, share the same legal theory, and are "reasonably coextensive" of the claims of the Class.  Thus, the typicality requirement is satisfied

here.

### D.       Rule 23(a)(4) − Adequacy of Representation

Rule 23(a) also requires the representative parties to "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The Ninth Circuit set a two-prong test for this requirement: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.2003) (citing *Hanlon*, 150 F.3d at 1020).

Here, Plaintiff is an adequate representative because she is a member of the Class she seeks to represent, shares the same claims and interest in obtaining relief as all other class members, and has no conflicts of interests with other class members. *Beck-Ellman*, 283 F.R.D. at 567; *In re Ferrero*, 278 F.R.D. at 559; *see Falcon*, 457 U.S. at 157-8, n.13 (noting that where the claims of the class and class representatives are coextensive, there is no conflict).   Plaintiff has also demonstrated her adequacy through her participation thus far in this litigation (*see* Astiana Dep.), and was found to be an adequate class representative in another food labeling class action case.   *Kashi Co.*, 2013 WL 3943265 at *16.

In addition, proposed Class Counsel (*i.e.*, Joseph N. Kravec, Jr. of Feinstein Doyle Payne & Kravec, LLC, Michael D. Braun of the Braun Law Group, P.C., and Janet Lindner Spielberg of the Law Offices of Janet Lindner Spielberg) are adequate, as they are qualified, experienced, and generally able to conduct the proposed litigation as required by Fed.R.Civ.P. 23(g).   *See* Kravec Decl. Exs. 3-5 (Resumes).   In fact, a Court within this District has already recognized the abilities of Messer's Kravec, Braun and Ms. Spielberg in appointing them co-lead class counsel while certifying a nationwide litigation class against Diamond Foods, Inc. for the company falsely labeling packages of shelled walnuts (*see Zeisel*, 2011 WL 2221113 at *9) and all three were recently named Co-Lead Class Counsel on behalf of a California-wide litigation class against Bear Naked, Inc. for the company falsely labeling its food products as "100% Natural."   Kravec Decl. Ex. 2.   Moreover, Mr. Kravec was recently appointed Co-Lead Class Counsel on behalf of a California-wide litigation class against Kashi for the company falsely labeling its food products as "All Natural" and "Nothing Artificial."   *Kashi Co.*, 2013 WL 3943265.   Here, proposed Class Counsel have also demonstrated their adequacy by vigorously prosecuting this action through discovery and litigation of B&J's motion to dismiss.   *See* Dkt. No. 62

(denying B&J's motion to dismiss); *In re Emulex Corp.*, 210 F.R.D. 717, 720 (C.D. Cal. 2002) (In evaluating the adequacy of counsel, "a court may examine the attorneys' professional qualifications, skill, experience, and resources)(citations omitted).

Respectfully, Plaintiff and proposed Class Counsel are adequate.

### E.    Rule 23(a)(2) Commonality / Rule 23(b)(3) Predominance[12]

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal–Mart Stores, Inc.*, 131 S.Ct. at 2551.  This requires that the "claims must depend on a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  Commonality is satisfied by "existence of shared legal issues with divergent factual predicates" or a "common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019–20.  All questions of fact and law need not be common to satisfy the rule. *Rodriguez*, 591 F.3d at 1122.

To satisfy predominance, it is not enough to establish that common questions of law or fact exist. "Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022.  Class certification under Rule 23(b)(3) is proper when common questions present a significant portion of the case and can be resolved for all class members in a single adjudication.  *Id.* The predominance test is more rigorous as it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-624 (1997).  Despite the enhanced rigor, the Supreme Court noted "[p]redominance is a test readily met in certain cases alleging consumer…fraud." *Id.* at 625.

### 1.    Common Questions Exist for Plaintiffs and the Class

The commonality element is easily satisfied for Plaintiff and the Class.

Here, Plaintiff's and all Class members' claims each arise from B&J's identical misrepresentations that the B&J Ice Cream Products were "All Natural" when in fact these products used alkalized cocoa processed with a substance recognized by federal regulations as synthetic.  These

---

[12] Post *Wal-Mart Stores, Inc.*, the commonality and predominance requirements have effectively merged.  Plaintiff accordingly addresses them together.

1   misrepresentations are particularly acute because of B&J's associated violation of Section

2   135.110(f)(2).  Plaintiff's and Class members' claims depend on common factual and legal contentions

3   the determination of which will resolve issues that are central to the validity of their claims in a single

4   stroke.  *Wal–Mart Stores, Inc.*, 131 S.Ct. at 2551.  Such common questions include:  (1) whether B&J

5   labeled the B&J Ice Cream Products "All Natural"; (2) whether the B&J Ice Cream Products labeled

6   "All Natural" used alkalized cocoa alkalized with a non-natural alkalizing agent; (3) whether B&J Ice

7   Cream Products that include alkalized cocoa processed with a non-natural alkalizing agent are "All

8   Natural"; (4) whether B&J's "All Natural" labeling and failure to comply with 21 C.F.R. §

9   135.110(f)(2) was likely to deceive class members or the general public; and (5) the appropriate

10  measure of restitution and/or restitutionary disgorgement.

11      These common contentions satisfy Fed.R.Civ.P. 23(a)(2) and, as discussed below, predominate

12  over any individual issues, as recent certifications of similar labeling misrepresentation claims by this

13  Court and other district courts confirm.[13]

14          **2.  Common Questions of Law Predominate As To Plaintiff's Consumer
                  Protection Claims**

15      Plaintiff asserts causes of action under the UCL[14] and the FAL, on behalf of herself and the

16  Class. ¶¶ 34-70.  Each of Plaintiff's consumer protection claims lends itself to proof by common

17  inquiry and therefore satisfies the predominance requirement set forth by Rule 23(b)(3).

18      Plaintiff asserts claims on her own behalf and on behalf of the Class under the "unlawful" prong

19  of the UCL.  ¶¶ 42-48.  Unlawful business acts include "any practices forbidden by law." *South Bay*, 72

20  Cal. App. 4th at 880.  As discussed above, Plaintiff will be able to establish through common evidence

21  that B&J's "All Natural" claims are false and misleading to consumers.  See supra.  Since federal and

22  state law identically prohibit false and misleading labeling of food, 21 U.S.C. § 343(a)(1); Cal. Health

23

---

24  [13] *See, e.g., Astiana v. Kashi*, 2013 WL 3943265, *4-5 (certifying "All Natural" labeling claims)*; In re
25  Pom Wonderful,*2012 WL 4490860, *1 (certifying labeling claims); *Johns*, 280 F.R.D. at 559  (same);
    *In re Ferrero*, 278 F.R.D. at 556 (same); *Johnson*, 276 F.R.D. at 521 (C.D.Cal.2011) (re-affirming
26  certification); *Zeisel*, 2011 WL 2221113, *1 (certifying labeling claims); *Chavez*, 268 F.R.D. at 380
    (same).

27  [14] Plaintiff asserts claims under the "unlawful," "unfair," and "fraudulent" prongs of the UCL.  ¶¶ 42-
28  59.  Each prong of the UCL is a separate theory of liability which offers an independent basis for relief.
    *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 878 (Cal. Ct. App. 1999).

---

& Safety Code §§ 110660, 110100(a), B&J's false and misleading labeling gives rise to UCL unlawful claims on behalf of the Class.  *South Bay*, 72 Cal. App. 4th at 880 ("section 17200 "borrows" violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq.'").  Notably, the proof needed to establish these violations is not based on any individualized factor and is common across the Class.

Plaintiff also asserts claims on her own behalf and on behalf of the Class under the "unfair" prong of the UCL.  ¶¶ 49-53.  Under this prong, the Court must examine the impact of B&J's practice "on its alleged victims, balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim...."  *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (Cal. Ct. App. 1980); *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal. App. 4th 1388, 1425 n. 15 (Cal. Ct. App. 2002) (same).  Here again, this is an inquiry that is common to all members of the Class.  B&J's motivation – increased sales and market share – is not unique to Plaintiff or any member of the Class.  Similarly, the harm to Plaintiff resulting from the purchase of the B&J Ice Cream Products is no different than the harm to any of those she seeks to represent.

Plaintiff also asserts claims on her own behalf and on behalf of the Class under the "fraud" prong of the UCL and the FAL.[15]  ¶¶ 54-59. For these claims, Plaintiff must demonstrate that her own individual reliance on B&J's "All Natural" statements resulted in injury in fact, *In re Tobacco II Cases*, 46 Cal.4th 298, 325-27 (Cal. 2009), and show that "members of the public are likely be  deceived" by B&J's misrepresentations.  *Williams v. Gerber Prods.*, 552 F.3d 934, 938 (9th Cir. 2008).  For class members, however, relief "is available without individualized proof of deception, reliance and injury." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (citing *Tobacco II*, 46 Cal 4th at 320).  Plaintiff can prove individual injury and reliance (Astiana Dep. at 19:24-20:2, 20:23-21:6, 51:21-52:6, 118:17-24 (testifying she relied on the "All Natural" statement in deciding to purchase B&J products)) and all other elements may be proved on a common basis.

---

[15] The same elements of proof apply to both a UCL "fraud" claim and the FAL. *See Williams*, 552 F.3d at 938.

### 3. Common Questions of Law Predominate As To Plaintiff's Common Law Fraud and Quasi Contract Claims

Plaintiff brings a claim for common law fraud, which requires proof of (1) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage. *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 481, 80 Cal. Rptr. 2d 329, 354 (1998)(citing Civ.Code, §§ 1572, 1709-1710)(further citations omitted). As above, these elements can be proved from common evidence that 1) B&J misrepresented that the B&J Ice Cream Products were "All Natural;" 2) that the "All Natural" statement is material to the average consumer; 3) that B&J knew that the ice cream was not "All Natural;" 4) that B&J intended to deceive consumers about the nature of its ingredients; 5) that Plaintiff justifiably relied on B&J's "All Natural" misrepresentation; and 6) that Plaintiff and class members were damaged by buying a product that were not "All Natural." Further, no individual inquiry of absent class members is necessary since the Court can "find an inference or rebuttable presumption of reliance by each class member without his direct testimony." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814, 484 P.2d 964, 973 (1971); *Chavez;* 268 F.R.D. at 376 (certifying a nationwide litigation class for common law fraud and other claims where defendant mislabeled a food product's source of origin).

Plaintiff also asserts a cause of action for restitution based on quasi-contract on behalf of herself and the Class. ¶¶ 68-70. Like Plaintiff's consumer protection claims, common questions of law predominate on these claims, satisfying Rule 23(b)(3).

Plaintiff's alternative claim for restitution based on quasi-contract may be proved by evidence of receipt and unjust retention of a benefit at the expense of another. *See McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1490 (2006)("unjust enrichment is a basis for obtaining restitution based on quasi-contract"); Dkt. No. 62 at 16-17 ("unjust enrichment is typically alleged in connection with a 'quasi-contractual' claim I order to avoid unjustly conferring a benefit upon a defendant where there is no valid contract")(citations omitted). This claim focuses on B&J's conduct and may also be proved by the common evidence described above. *See* Sections II.A-F, *supra*; *see also Zeisel*, 2011 WL 2221113,

*1 (certifying a nationwide quasi-contract claim).

### 4.  Individual Issues of Damages Do Not Predominate

The determination of relief does not usually defeat predominance, and it does not do so here, as damages are capable of measurement on a class basis from B&J's records of sales, profits, and prices. *See* Section II.F; *Johns*, 280 F.R.D. at 559 ("amount of damages…does not defeat class action certification") (citing *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)); *Guido v. L'Oreal, USA, Inc.,* 284 F.R.D. 468, 479 (C.D. Cal. 2012) (finding price premium damages susceptible of class-wide treatment).

The Supreme Court in *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), held that a plaintiff in a complex antitrust case seeking class certification must submit a damage model consistent with their theory of liability.  The Ninth Circuit has affirmed that *Comcast* did not change what is required of plaintiffs seeking class certification.  *See Leyva v. Medline Industries Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013).  The Ninth Circuit reiterated in *Leyva* that ""[i]n this circuit...damage calculations alone cannot defeat certification." *Id.* at 513-14.  The court then affirmed the long-standing principle that "'[t]he amount of damages is invariably an individual question and does not defeat class action treatment.'" *Id.* at 513-14 (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)).  The court reversed the district court's denial of class certification, explaining that unlike in *Comcast*, damages in *Leyva* could be calculated based on the defendant's computerized payroll and time-keeping database. 716 F.3d at 514.

Where proving damages for a plaintiff's theory of liability does not involve an over-broad pool of damages and may be determined by simple math, an expert opinion is unnecessary at the class certification stage.  *Barbosa v. Cargill Meat Solutions Corp.*, 2013 WL 3340939, at 25 n.2 (E.D.Cal. July 2, 2013).  *See also Gaudin v. Saxon Mortgage Services, Inc.*, 2013 WL 4029043 (N.D.Cal., Aug. 5, 2013) (certifying class and rejecting the defendant's reliance on *Comcast*, because the plaintiff proposed no calculation that would assess damages on the basis of dismissed or abandoned theories of liability); *Parra v. Bashas', Inc.*, --- F.R.D. ----, 2013 WL 2407204, at *32 and n.39 (D.Ariz. May 31, 2013)(*Comcast* does not apply when losses can be determined by a "purely mechanical process" or a "mathematical calculation.")

Significantly, courts both pre-and post-*Comcast* have certified nationwide and statewide classes in similar food labeling cases based on the same types of financial.  *Zeisel*, 2011 WL 2221113, at *10 (certification of a nationwide class pre-*Comcast* based on the same types of financial data and analysis here); *Kashi Co*., 2013 WL 3943265, *10 (same post-*Comcast*); *Bear Naked, Inc*., Case No. 3:11-cv-2890-H (BGS), Dkt. No. 110 at pp. 17-18 (same).  Thus, the ability to prove restitution on a common, class-wide basis supports class certification.

Here, restitutionary disgorgement of B&J's profits can be calculated based on the financial records of B&J showing what its sales, profits and costs were on the products at issue.  Stipulation ¶¶ 2-4; Kravec Decl. Ex. 26.  Plaintiff can get sales information in California through subpoenas of retailers or from retail tracking servicers such as A.C. Nielsen Company ("Nielsen") or Information Resources Inc. ("IRI") who gather and sell point-of-sales data, including products sold, the stores sold at, and the prices paid.[16]   *See Info. Res., Inc. v. Dun & Bradstreet Corp*., 294 F.3d 447, 448-49 (2d Cir. 2002)(describing continuous data collection by Nielsen and IRI).  Plaintiff can use simple math to determine the per-unit profits B&J made on the B&J Ice Cream Products from its internal records, and multiply this by the number of sales in California from the third-party records.  This calculation can be done by taking B&J's total profits and dividing them by the total number of units sold, to get the per-unit profits.  The per-unit profits can be multiplied by the number of units sold in California based on third-party records for the total amount of restitutionary disgorgement for the class, or multiplied by the number of units a class member purchased for an individual calculation of restitutionary disgorgement.

Similarly, full restitution of the amount Class Members spent on the B&J Ice Cream Products can be calculated from the California sales data from retailers, Nielsen or IRI.  This can be calculated by taking the total number of sales of the products, and the price each of the products sold for in California, based on information from third-party sources, and combining all of the sales for the full restitution number.  The per-unit restitution can be calculated by dividing the full restitution by the total number of units sold in California, and multiplied by the number of units a class member purchased for any individual calculation of restitution.

---

[16] *See also* http://www.nielsen.com/us/en/nielsen-solutions/nielsen-measurement/nielsen-retail-measurement.html and http://www.iriworldwide.com/About.aspx#1.

1    Partial restitution can be determined based on B&J's wholesale prices of the products sold in

2    California.  The total partial restitution amount can be calculated by determining the per unit wholesale

3    price of the products by taking B&J's total revenue and dividing it by the number of units sold to

4    calculate the per-unit wholesale cost.  Stipulation, ¶¶ 2-3; Kravec Decl. Ex. 26.  This per-unit wholesale

5    cost can be multiplied by the number of units sold in California based on third-party data to generate

6    the total partial restitution amount.  Also, the per-unit wholesale cost can be multiplied by the number

7    of units a class member purchased for any individual calculation of partial restitution.

8    Finally, should it be necessary to determine a price premium for the "ultra-premium" B&J Ice

9    Cream Products, this premium can be calculated by using simple math based on the sales information

10   from retailers, Nielsen or IRI comparing the price of the B&J Ice Cream Products.  Sales information

11   can be gathered for both B&J's products and competing ice cream products that are not labeled "All

12   Natural."  The average price of the B&J products can be calculated by taking all of the sales of the

13   products in California based on third-party data and dividing the total sales amount by the total number

14   of sales.  This calculation can be done for comparable competing products to calculate the average price

15   of similar products not labeled "All Natural," and the premium can be determined by subtracting the

16   average price of the competing non-natural product from the average price of the similar B&J product.

17   In sum, questions capable of determination on a class basis predominate and will drive

18   resolution of Plaintiff's and all class members' claims in this action.  *See Kashi Co.*, 2013 WL 3943265

19   at *11 (certifying a California state Class based on false and misleading "All Natural" claims on food

20   products based on these same methods of calculating restitution post-*Comcast*); Kravec Dec. Ex. 2 at 17

21   (same); *Zeisel*, 2011 WL 2221113 at *10 (certifying a nationwide Class for mislabeled food products

22   based on similar methods of calculating restitution pre-*Comcast*).

23   **F.    Rule 23(b)(3) − Superiority**

24   Rule 23(b)(3) also requires that the Court determine whether "a class action is superior to other

25   available methods for the fair and efficient adjudication of the controversy," based upon the following

26   nonexclusive factors:

27        (A) the interest of members of the class in individually controlling the
          prosecution. . . of separate actions; (B) the extent and nature of any
28        litigation concerning the controversy already commenced by. . . members

of the class; (C) the desirability. . . of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).  These factors reflect the appropriateness of class certification here.

### 1. Rule 23(b)(3)(A)

The first factor (the interest of each class member in controlling the prosecution of separate actions) supports the superiority of a class action in the underlying matter.  In a case with tens of thousands of class members (or more), each class member's interest in aggregating claims into a single class action lawsuit substantially outweighs the interest of any class member in individual control of the litigation.  *See*, *e.g.*, *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The more claimants there are, the more likely a class action is to yield substantial economies in litigation").  Further, class members' individual claims here will be relatively small, making individual litigation impracticable.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."); *In re Worldcom Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) ("Few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail").

### 2. Rule 23(b)(3)(B)

Plaintiff's counsel are not aware of any pending litigation in which the claims at issue in this case are being separately pursued by any individual putative class members.  Thus, the second factor (the extent and nature of any litigation concerning the controversy already commenced by members of the class) also supports a finding of superiority.  *West v. Circle K Stores, Inc.*, 2006 WL 1652598, at *8 (E.D.Cal. June 12, 2006) ("In the absence of competing lawsuits, it is also unlikely that other individuals have an interest in controlling the prosecution of this action. . . ").[17]

### 3. Rule 23(b)(3)(C)

Analysis of the desirability of concentrating the litigation of the claims in the particular forum

---

[17] The copy-cat case *Tobin v. Conopco, Inc. et al.*, was voluntarily dismissed with prejudice on August 20, 2013.  *See* 12-cv-5881-JSW (N.D.Ca.), Dkt. No. 50.

also confirms that class treatment is a superior means of adjudicating these claims.  Specifically, since Plaintiff purchased B&J's products in this district, and her claims are brought only on behalf of a Class of California consumers, concentration of litigation in this forum is appropriate.

### 4.   Rule 23(b)(3)(D)

Analysis of the fourth factor (difficulties likely to be found in the management of a class action) further confirms the superiority of the class mechanism here.

Quite simply, there is no reason to believe that the prosecution of the claims of the putative class members in a single class action will create more management problems than the alternative (*i.e.*, the prosecution of thousands of separate lawsuits by individual class members).  *See supra* (showing common proof).  In fact, it would be more burdensome on the courts, parties and judicial system to entertain a multiplicity of lawsuits regarding B&J's common conduct and, in the absence of a class action, thousands of consumers would also have no reasonable means of enforcing their rights. *Carnegie*, 376 F.3d at 661 ("a class action has to be unwieldy indeed before it can be pronounced an inferior alternative. . . to no litigation at all."); *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1165 (7th Cir. 1974) (in deciding the "best" method, court may consider "inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually."); *Jordan v. Paul Financial, LLC*, 285 F.R.D. 435, 467 (N.D.Cal. 2012) (noting failure to certify due to unmanageability is disfavored).

Accordingly, prosecuting the case at bar as a class action does not present any difficulties within the meaning of Rule 23(b)(3)(D), and the class mechanism is clearly the superior vehicle by which to adjudicate this controversy.

## IV.   <u>CONCLUSION</u>

For the reasons discussed herein, Plaintiff respectfully requests the Court certify this case as a class action, appoint her as Class Representative, and appoint Class Counsel (*i.e.*, Joseph N. Kravec, Jr. of Feinstein Doyle Payne & Kravec, LLC, Michael D. Braun of the Braun Law Group, P.C., and Janet Lindner Spielberg of the Law Offices of Janet Lindner Spielberg), as indicated in the attached proposed order.

1  DATED:  September 25, 2013

2

**FEINSTEIN DOYLE PAYNE
& KRAVEC, LLC**

3  By: ___s/Joseph N. Kravec, Jr.___
          Joseph N. Kravec, Jr.

4  Wyatt A. Lison
5  429 Forbes Avenue
   Allegheny Building, 17th Floor
6  Pittsburgh, PA  15219
   Phone:  (412) 281-8400
7  Fax:     (412) 281-1007
   Email:  jkravec@fdpklaw.com
8            wlison@fdpklaw.com

9  Michael D. Braun
   **BRAUN LAW GROUP, P.C.**
10 10680 W. Pico Boulevard, Suite 280
   Los Angeles, CA 90064
11 Phone:    (310) 836-6000
   Fax:       (310) 836-6010
12 Email:  service@braunlawgroup.com

13 Janet Lindner Spielberg
   **LAW OFFICES OF JANET
14    LINDNER SPIELBERG**
   12400 Wilshire Blvd., Suite 400
15 Los Angeles, CA 90025
   Phone:    (310) 392-8801
16 Fax:       (310) 278-5938
   Email:  jlspielberg@jlslp.com

17 ***Attorneys for Plaintiff Skye Astiana***

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

STATE OF PENNSYLVANIA      )
                          )   ss.:

COUNTY OF ALLEGHENY       )

I am employed in the County of Allegheny, State of Pennsylvania.  I am over the age of 18 and not a party to the within action.  My business address is 429 Forbes Avenue, Allegheny Building, 17th Floor, Pittsburgh, PA  15219.

On September 25, 2013, using the Northern District of California's Electronic Case Filing System, with the ECF ID registered to Joseph N. Kravec, Jr., I filed and served the document(s) described as:

**NOTICE MOTION AND MOTION FOR CLASS CERTIFICATION;**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**[X]**    **BY ELECTRONIC TRANSMISSION USING THE COURT'S ECF SYSTEM:**  I caused the above document(s) to be transmitted by electronic mail to those ECF registered parties listed on the Notice of Electronic Filing (NEF) pursuant to Fed.R.Civ.P. 5(d)(1) and by first class mail to those non-ECF registered parties listed on the Notice of Electronic Filing (NEF).  *"A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of an electronic filing.  The NEF, when e-mailed to the e-mail address of record in the case, shall constitute the proof of service as required by Fed.R.Civ.P. 5(d)(1). A copy of the NEF shall be attached to any document served in the traditional manner upon any party appearing pro se."*

I declare that I am admitted *pro hac vice* in this action.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on September 25, 2013, at Pittsburgh, Pennsylvania.


                                    s/Joseph N. Kravec, Jr.
                                    Joseph N. Kravec, Jr.