Michael D. Braun (167416)
**BRAUN LAW GROUP, P.C.**
10680 W. Pico Blvd., Suite 280
Los Angeles, CA 90064
Tel: (310) 836-6000
Fax: (310) 836-6010
Email: service@braunlawgroup.com

Joseph N. Kravec, Jr.(admitted *pro hac vice*)
Wyatt A. Lison (admitted *pro hac vice*)
**FEINSTEIN DOYLE PAYNE
    & KRAVEC, LLC**
429 Forbes Avenue
Allegheny Building, 17th Floor
Pittsburgh, PA 15219
Tel: (412) 281-8400
Fax: (412) 281-1007
Email: jkravec@fdpklaw.com
          wlison@fdpklaw.com

Janet Lindner Spielberg (221926)
**LAW OFFICES OF JANET
    LINDNER SPIELBERG**
12400 Wilshire Boulevard, Suite 400
Los Angeles, CA 90025
Tel: (310) 392-8801
Fax: (310) 278-5938
Email: jlspielberg@jlslp.com

*ATTORNEYS FOR PLAINTIFF*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| SKYE ASTIANA  on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BEN & JERRY'S HOMEMADE, INC.,<br><br>Defendant. | CASE NO.:  10-cv-04387-PJH<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:    November 20, 2013<br>Time:   9:00 a.m.<br>Ctrm:   3, 3rd Floor |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................................. 1

II.     THE PROPOSED CLASS IS ASCERTAINABLE ......................................................... 1

    A.    Lack Of Ascertainability Does Not Preclude Class Certification ................................. 1

    B.    B&J's failure to maintain records of consumer purchases does not render the class
        unascertainable ................................................................................................................. 2

    C.    B&J's "Scavenger Hunt" Theory Also Fails .................................................................. 2

III.    PLAINTIFF HAS ESTABLISHED NUMEROSITY ..................................................... 4

IV.     PLAINTIFF HAS STANDING AND INJURY-IN-FACT.............................................. 4

    A.    Plaintiff Has Proffered Sufficient Evidence That She Paid A Price Premium and
        suffered an economic injury ........................................................................................... 4

    B.    Plaintiff Has Standing As To All Of The B&J' Ice Cream Products At Issue Here ................... 7

    C.    Plaintiff Has Standing To Seek Injunctive Relief ......................................................... 8

V. PLAINTIFF HAS SHOWN COMMONALITY AND PREDOMINANCE ......................................... 8

    A.    The *Kashi* "Organic" Ruling Is Inapposite Because The Federal Regulations That
        Control Here And That B&J Has Violated Did Not Apply In *Kashi*........................................... 8

    B.    B&J's Litigation "Study" Does Not Advance Its Arguments ................................................... 11

    C.    Contrary To B&J's Claim, Reliance, Materiality, And Causation Are Not "Inherently
        Individual." ................................................................................................................... 12

VI.     DAMAGES ISSUES DO NOT PRECLUDE CERTIFICATION ................................ 13

VII.    PLAINTIFF IS TYPICAL............................................................................................... 14

VIII.   B&J HAS NOT REFUTED ADEQUACY ..................................................................... 14

IX.     B&J HAS NOT REFUTED SUPERIORITY ................................................................. 15

X.      CONCLUSION ................................................................................................................. 15

1

2

# TABLE OF AUTHORITIES

3
## CASES

4   *Anderson v. Jamba Juice Co.,* 888 F.Supp.2d 1000 (N.D.Cal. 2012)...........................................7

5   *Astiana v. Ben & Jerry's Homemade, Inc.*, 2011 WL 2111796 (N.D.Cal. May 26, 2011) ............................ 5

6   *Astiana v. Dreyer's Grand Ice Cream, Inc.,* 2012 WL 2990766 (N.D.Cal. July 20, 2012)..................*passim*

7   *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D.Cal. July 30, 2013) ...........................................*passim*

8   *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 105 F.R.D. 506 (S.D Ohio 1985) .................. 14, 15

9   *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) ......................................................... 13

10  *Chavez v. Blue Sky Natural Beverage Co.*, 340 Fed. Appx. 359 (9th Cir. 2009)............................. 6

11  *Chavez v. Blue Skye Natural Bev. Co., Inc.*, 268 F.R.D. 365 (N.D.Cal. 2010)............................... 2

12  *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013) ........................................................ 13

13  *Dorfman v. Nutramax Laboratories, Inc.*, 2013 WL 5353043 (S.D.Cal. Sept. 23, 2013) ..................... 8

14  *Galvan v. KDI Distrib.*, 2011 WL 5116585 (C.D.Cal. Oct. 25, 2011) ....................................... 2

15  *In re Aqua Dots Prods. Liability Litig.*, 654 F.3d 748 (7th Cir. 2011)................................... 15

16  *In re Google AdWords Litig.*, 2012 WL 28068 (N.D.Cal. Jan. 5, 2012)...................................... 7

17  *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
       --- F.R.D. ----, 2013 WL 1182733 (D.Me. Mar. 20, 2013) ............................................. 15
18

19  *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2012 WL 253298 (N.D.Cal. Jan. 26, 2012) ............... 2, 3

20  *In re Tobacco II Cases*, 46 Cal.4th 298 (Cal. 2009) ..................................................... 12

21  *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) ................................ 3

22  *Johnson v. General Mills, Inc. et al*, 2011 WL 1514702 (C.D. Cal. Apr. 20, 2011) ........................ 6

23  *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011)............................................... 6

24  *Leyva v. Medline Industries Inc.*, 716 F.3d 510 (9th Cir. 2013) ......................................... 13

25  *Major v. Ocean Spray Cranberries, Inc.*, 2013 WL 2558125 (N.D.Cal. June 10, 2013) ...................... 7

    *Mass. Mut. Life Ins. Co. v. Super. Ct.*, 97 Cal.App.4th 1282,
26     119 Cal.Rptr.2d 190 (Cal. Ct. App. 2002) .......................................................... 12

27  *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) .................................. 6

28  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012)................................. 3

*Morgan v. U.S.*, 298 U.S. 468 (1936)..............................................................................................13

*Pacific States Box & Basket Co. v. White*, 296 U.S. 176 (1935)....................................................13

*Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580 (C.D.Cal. 2008) ................................................2

*Peviani v. Natural Balance, Inc.*, 22011 WL 754958 (S.D. Cal. Feb. 24, 2011)..............................6

*Red v. Kraft Foods, Inc.*, 2012 WL 8019257 (C.D.Cal. April 12, 2012) ...........................................2

*Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D.Cal. 2012) ...........................................2

*Rogge v. U.S.*, 128 F.2d 800 (9th Cir. 1942) ..................................................................................13

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) ...............................................6, 12

*Wolph v. Acer Am. Corp.*, 272 F.R.D. 477 (N.D.Cal. 2011) .............................................................2

*Wright v. General Mills, Inc.*, 2009 WL 3247148 (S.D.Cal. Sept. 30, 2009) ..................................8

**STATUTES**

21 U.S.C. §343(k)........................................................................................................................1, 12

Cal. Bus. & Prof. Code § 17535 .....................................................................................................6

**RULES**

Fed.R.Civ.P. 23(a)(4) ....................................................................................................................15

Fed.R.Civ.P. 23(b)(3) ....................................................................................................................15

**REGULATIONS**

7 C.F.R. § 205.605(b).................................................................................................................4, 10

21 C.F.R. § 135.110(f) .....................................................................................................................9

21 C.F.R. § 135.110(f)(2)...........................................................................................................1, 13

21 C.F.R. § 101.22(a) .......................................................................................................................1

21 C.F.R. § 101.22(a)(1) .................................................................................................................10

21 C.F.R. § 101.22(a)(3) .................................................................................................................10

21 C.F.R. § 101.22(i)....................................................................................................................1, 9

21 C.F.R. §135.110(f)(2) .......................................................................................................1, 12, 13

1  **I.      INTRODUCTION**

2          In opposing class certification ("Opp.") (Dkt. #122-3) in this case involving the ice cream flavoring

3  ingredient alkalized cocoa, Defendant Ben & Jerry's Homemade, Inc. ("B&J") sidelines the controlling

4  federal provisions that establish a clear standard with regard to flavoring ingredients in ice cream.  *See* 21

5  U.S.C. §343(k) (requiring disclosure of artificial flavors on labels); 21 C.F.R. §135.110(f)(2)

6  (implementing §343(k) for labeling of ice cream); *see also* §101.22(a) (implementing §343(k) defining

7  artificial and natural flavors); §101.22(i) (implementing §343(k) defining characterizing flavors of foods).

8  In tandem with downplaying the applicable regulations, B&J ignores *Astiana v. Dreyer's Grand Ice*

9  *Cream, Inc.,* 2012 WL 2990766, at *4-11 (N.D.Cal. July 20, 2012), another "all natural" ice cream labeling

10  action, wherein Judge Chen construed these federal provisions to undermine the position B&J posits in

11  opposing class certification here.  In *Dreyer's,* as here, the pertinent packaging failed to disclose that one of

12  the ingredients, alkalized cocoa, was processed using a synthetic and/or artificial alkalizing agent, *i.e.,*

13  potassium carbonate, as opposed to a nonsynthetic one.  Judge Chen rejected the defendant ice cream

14  maker's argument that because potassium carbonate is commonly used as an alkalizing agent, nothing

15  artificial or synthetic had been used in its ice cream.  *Id.* at *11.  Judge Chen further held that if an ice

16  cream product contains *any* artificial flavor that simulates, resembles, or reinforces the characterizing

17  flavor, the product **must** be labeled "artificially flavored."  *Id.* at *6.

18          Here, B&J violated Sections 135.110(f)(2) by failing to label its ice cream that contained

19  artificially-flavored chocolate "artificially flavored," and instead misleadingly labeled the products,

20  including all of the products' flavor ingredients, as being "All Natural."  Rather than grapple with the on-

21  point ice cream authority in *Dreyer's,* B&J seizes on a single inapposite conclusion in *Astiana v. Kashi*

22  *Co.*, 291 F.R.D. 493 (S.D.Cal. July 30, 2013), which did not involve ice cream or the federal flavoring

23  regulations applicable to ice cream.  At the same time, B&J ignores the broader rulings in *Kashi* which do

24  apply here with full force.  Beyond its selective reliance on *Kashi*, B&J employs a scattershot approach in

25  opposing class certification that fails on every front.  The Court should certify the proposed Class.

26  **II.     THE PROPOSED CLASS IS ASCERTAINABLE**

27          **A.      Lack of Ascertainability Does Not Preclude Class Certification**

28          A shown below, the proposed class here is readily ascertainable.  But even if it were not,

certification should not be denied on this ground.  B&J argues that the proposed class is not ascertainable but ignores that in a key case it proffers for this point, *Red v. Kraft Foods, Inc.*, 2012 WL 8019257, *6 (C.D.Cal. April 12, 2012), (Opp. at 4), the court emphasized that "[a] lack of ascertainability alone will generally not scuttle class certification."  *See also Galvan v. KDI Distrib.*, 2011 WL 5116585, at *5 (C.D.Cal. Oct. 25, 2011) ("[T]he class definition may include individuals who...have inadequate proof to go forward with the class.  However, these ascertainability issues are not fatal to class certification and may be addressed later in the litigation."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 253298, at *3 (N.D.Cal. Jan. 26, 2012) (citing several cases for the proposition that "[n]umerous courts have held that a class can be certified even if its membership is unclear or overbroad").

## B.   B&J's Failure to Maintain Records of Consumer Purchases Does Not Render the Class Unascertainable

B&J's theory that no class may be ascertained because it does not maintain records of consumer purchases (Opp. at 4) has been denied by many courts, including *Kashi* on which B&J principally relies:

> Defendant's concern that the Court will have difficulty identifying members of the class is unavailing. Because Defendant does not have records of consumer purchases, and potential class members will likely lack proof of their purchases, Defendant argues that the Court will have no feasible mechanism for identifying class members and will have to pursue proof individual to each class member.  However, "[t]here is no requirement that 'the identity of the class members...be known at the time of certification.'"  If class actions could be defeated because membership was difficult to ascertain at the class certification stage, "there would be no such thing as a consumer class action."  As long as the class definition is sufficiently definite to identify putative class members, "[t]he challenges entailed in the administration of this class are not so burdensome as to defeat certification."

291 F.R.D. at 500 (quoting and relying on *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D.Cal. 2012), and *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D.Cal. 2011)); *see also Chavez v. Blue Skye Natural Bev. Co., Inc.*, 268 F.R.D. 365, 376-77 (N.D.Cal. 2010) (beverage mislabeling class sufficiently identifiable); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 594 (C.D.Cal. 2008) (class ascertainable where definition listed objective characteristics and consumers could "determine whether they are class members").

## C.   B&J's "Scavenger Hunt" Theory Also Fails

B&J's other ascertainability theory, while more novel, is equally unavailing.  B&J claims that the proposed class is not ascertainable because establishing that the subject B&J Ice Cream Products included

1  cocoa alkalized with a synthetic or artificial ingredient is akin to a "scavenger hunt."  B&J Opp. at 4.

2  According to B&J, no class may be certified unless and until Plaintiff establishes beyond doubt the

3  particular alkalizing agent in every class member's Ice Cream purchase.  *See id.*  This is not Plaintiff's

4  burden.  See *In re TFT-LCD*, 2012 WL 253298, at *2 (certifying class and quoting *J. Truett Payne Co.,*

5  *Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981) for the proposition: "[I]t does not come with

6  very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself

7  inflicted"); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 808 (7th Cir. 2012) ("In

8  essence, it is important not to let a quest for perfect evidence become the enemy of good evidence")

9  (quoted in *In re TFT-LCD*, 2012 WL 253298, at *2).

10      In any event, Barry Callebaut, the supplier of alkalized cocoa used in B&J's ice cream, confirmed

11  that its alkalized cocoa was not made with all natural ingredients and was not a natural flavor.  Dkt. #116-

12  10 (Barry Callebaut through Ben DeShryver ("DeShryver Dep.")) at 88:17-90:10.  This is true **regardless**

13  **of which alkalizing agent is used**.  *Id.* at 56:7-13.  Likewise, Plaintiff's rebuttal expert confirms neither

14  alkalized cocoa nor the alkalizing agent used here are natural.  Kravec Dec. Ex. 3, Rebuttal Dec. of Kurt

15  Hong, M.D. Ph.D., ¶¶ 21, 23, 27.  This compelling evidence eviscerates B&J's ascertainability theory.

16      B&J seeks to squash a third piece of supporting evidence based on B&J's internal documents and

17  referenced in Plaintiff's prior briefing, claiming that it produced the documents "inadvertently."  *See* Dkt.

18  #128-3.  Although no ruling on B&J's motion seeking to recall these documents has been made, B&J's

19  counsel nonetheless has threatened sanctions if Plaintiff discusses those documents here.  Kravec Dec., Ex.

20  5.  By now, the Court is no doubt well aware of the content of these documents and their import so we need

21  not discuss them further here.  But even if these internal documents are disregarded, the proposed class is

22  still readily ascertained, and B&J's contrary argument is pure obfuscation.

23      B&J states that while it utilizes 60 different cocoa-based ingredients, 13 of these do not use alkali.

24  B&J Opp. at 3-4.  Yet, B&J admits that Food and Drug Administration ("FDA") rules require that any food

25  product containing alkalized cocoa must so state on its label.  Declaration of Paul Szalkucki ("Szalkucki

26  Decl.") (Dkt. #124-00) ¶ 12.  This case involves **only** Ice Cream Products whose labels identify alkalized

27  cocoa as an ingredient.  *See* Ice Cream Product labels (Dkt. ##116-1, 116-2).  B&J seeks to confuse the

28  Court with the immaterial point that "[i]f a consumer bought Ice Cream that used exclusively one of those

13 non-alkalized cocoa ingredients, he or she is not a class member." Opp. at 4. However, the proposed class includes **only** those consumers who purchased Ice Cream Products that included alkalized cocoa as an ingredient. Indeed, B&J has so stipulated. *See* Stipulation for Class Certification ("Stipulation") (Dkt. #116-8) ¶ 9 ("Each of the PRODUCTS included in the proposed class contained some form of alkalized cocoa listed amongst the PRODUCTS' ingredients as 'cocoa (processed with alkali)'").

B&J next seeks to take advantage of the fact that while Unilever's cocoa suppliers are required to adhere to Unilever's specifications for any ingredient that goes into B&J's Ice Cream Products, but B&J never specified what alkalizing agent was to be used in making the alkalized cocoa included in the B&J Products. *See* Fed.R.Civ.P. 30(b)(6) Deposition of Ben & Jerry's (through Michael Graning) ("B&J Dep.") (Dkt. #116-7) at 20:25 to 21:9-18; DeShryver Dep. at 99:3-10. B&J likewise seeks traction from its failure to track what alkalizing agent was in fact utilized. Szalkucki Decl. ¶ 9. Based on these points, B&J claims that Plaintiff cannot establish that its Ice Cream Products used a synthetic or artificial alkalizing agent. Opp. at 4. Yet B&J **admitted** that "…Barry Callebaut was the only supplier who supplied B&J with alkalized cocoa powder for use in PRODUCTS where the cocoa powder formed the chocolate base of the ice cream." Stipulation ¶ 12. Nor has B&J disputed Plaintiff's evidence that the B&J Ice Cream Products for which Barry Callebaut supplied alkalized cocoa was processed with potassium carbonate primarily as well as a combination of sodium hydroxide and ammonium bicarbonate which are all synthetic substances. *See* Plaintiff's Opening Brief at 5 (citing DeShryver Dep. at 20:16-22 and 7 C.F.R. § 205.605(b), which list potassium carbonate, sodium hydroxide and ammonium bicarbonate as synthetic ingredients).

## III.   PLAINTIFF HAS ESTABLISHED NUMEROSITY

B&J's numerosity argument is a simple rehash of its ascertainability argument. *See* Opp. at 5. It fails for the reasons set forth in the preceding section.

## IV.   PLAINTIFF HAS STANDING AND INJURY-IN-FACT

### A.   Plaintiff Has Proffered Sufficient Evidence that She Paid a Price Premium and Suffered an Economic Injury

B&J next argues that Plaintiff lacks standing and injury-in-fact. By means of selectively quoting from Plaintiff's deposition testimony (wherein she was badgered by counsel), and ignoring her on-point statements, B&J seeks to give the impression that Plaintiff has no evidence that she paid a premium for the

B&J Ice Cream Products that she purchased because they were labeled "All Natural."  *See* Opp. at 6-7.

Plaintiff's pertinent deposition testimony includes the following:

> Q. ….Paragraph 5 also says, "Ms. Astiana is willing to and has paid a premium for foods that are all natural and has refrained from buying their counterparts that were not all natural." Do you see that?
> A  Yes.
>
> Q  That's also a true statement?
> A  Yes.

Deposition Testimony of Skye Astiana ("Astiana Dep.") (submitted herewith as Exhibit 1 to the accompany Declaration of Joseph N. Kravec, Jr.) at 86:20 to 87:2.  Plaintiff further testified:

> Q  ….Starting at line 10, it says, "Ms. Astiana," at line 11, "paid more for the B&J ice cream she purchased than she would have had to pay for other similar ice cream or frozen yogurt products that were 6 not all natural in that they contained man-made synthetic ingredients." Do you see that?
> A  Yes.
>
> Q  And that's a true statement?
> A  Yes.

*Id.* at 88:2-11.

Moreover, Plaintiff averred as follows in an interrogatory response:

> Plaintiff lost money because she paid more to buy Defendant's "All Natural" ice cream and frozen yogurt than she would have paid for similar ice cream or frozen yogurt that was not touted as "All Natural."  The premium Plaintiff paid for Defendant's "All Natural" products is the difference in price between Defendant's products and similar products not touted as "All Natural."  Although individual retailers or average retail price data from companies like Neilson are likely a more accurate source for pricing information, Plaintiff sets forth her best estimate of how much more expensive Defendant's ice cream and frozen yogurt she purchased are than similar other non-natural products, based on her past shopping experiences.  Based on her past shopping experiences, Plaintiff is generally aware of other brands, including private label and store brands, that she estimates are about .50 to .75 cents cheaper than the Ben and Jerry's ice cream and frozen yogurt she bought.

Dkt. # 123-2 (Plaintiff's Answers to Defendant's First Set of Interrogatories at No. 1).

In its ruling denying B&J's motion to dismiss, the Court rejected B&J's standing/injury-in-fact theory as follows:  "If the plaintiffs did indeed purchase the ice cream based on the representation that it was "all natural" and if that representation proves to be false, then they arguably have suffered an injury in fact."  *Astiana v. Ben & Jerry's Homemade, Inc.*, 2011 WL 2111796, at *5 (N.D.Cal. May 26, 2011).  The quoted deposition testimony and interrogatory response adequately demonstrate that Plaintiff purchased B&J Ice Cream Products based on the representation that they were "all natural" and that she paid a premium because of that representation.  Plaintiff suffered injury-in-fact and has standing.

Courts have routinely found similar allegations that plaintiffs did not receive what was advertised

and paid for sufficient to establish injury-in-fact for purposes of Article III and economic injury for purposes of the UCL. *See, e.g.*, *Chavez v. Blue Sky Natural Beverage Co.*, 340 F. App'x 359, 362 (9th Cir. 2009) (plaintiff adequately alleged injury-in-fact based on purchases of mislabeled sodas); *Peviani v. Natural Balance, Inc.*, 22011 WL 754958, *3 (S.D. Cal. Feb. 24, 2011) (plaintiff alleged economic injury because she paid more for the product than she would have absent the deceptive statements on its labels); *Johnson v. General Mills, Inc. et al*, 2011 WL 1514702, *1 (C.D.Cal. Apr. 20, 2011) (plaintiff suffered economic injury where he "purchased YoPlus but did not receive the promised digestive health benefit"); *Kwikset Corp. v. Super. Ct.*, 246 P.3d 877, 889 (Cal. 2011) (plaintiff adequately alleged injury based upon purchase of "Made in U.S.A." locksets).

 *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011), is instructive. The Ninth Circuit there ruled that each class member was injured because he or she was relieved of money in a challenged transaction and that loss was fairly traceable to defendants' actions. *Id.* at 1021 (finding class standing present where class members "came, saw, were conquered by stealth, and were relieved of their money" through a fee based rewards program). The Ninth Circuit likewise ruled in *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595 (9th Cir. 2012) (citing *Stearns*, 655 F.3d at 1021)[1]:

> Plaintiffs contend that class members paid more for the CMBS than they otherwise would have paid, or bought it when they otherwise would not have done so, because Honda made deceptive claims and failed to disclose the system's limitations. To the extent that class members were relieved of their money by Honda's deceptive conduct—as Plaintiffs allege—they have suffered an "injury in fact."

*Kwikset*, decided under the UCL and the False Advertising Law, Cal. Bus. & Prof. Code § 17535 ("FAL") (the basis for Plaintiffs' Seventh Cause of Action), also is on point. Plaintiffs there alleged that defendants falsely labeled products as "Made in U.S.A.," and that they relied on these labels and would not have bought the products in their absence. The Court held that these allegations satisfied standing requirements, because "labels matter,…consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source." *Id.* at 889. The Supreme Court explained that:

---

[1] The *Mazza* court vacated certification because, *inter alia*, the "small scale" of the challenged advertising campaign did not support a presumption of reliance since many class members would not have been exposed to it. *Id.,* 666 F.3d at 594, 596-97. The present case does not involve advertising of "limited scope," *id.* at 596, but labeling present on every product purchased by every class member.

From the original purchasing decision we know the consumer valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, i.e., that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue.

*Id.* at 890-91; *see also In re Google AdWords Litig.*, 2012 WL 28068, at *10 (N.D.Cal. Jan. 5, 2012) ("The requirement of concrete injury is satisfied when the Plaintiffs and class members in UCL and FAL actions suffer an economic loss caused by the defendant, namely the purchase of defendant's product containing misrepresentations."); *see also Kashi*, 291 F.R.D. at 500-01 (rejecting the same standing and injury-in-fact arguments B&J asserts here).

**B.    Plaintiff has Standing as to All of the B&J's Ice Cream Products at Issue Here**

The *Kashi* ruling relied on by B&J for one discrete point expressly rejected B&J's theory that Plaintiff here cannot sue as to the 27 Ice Cream Products labeled that she personally did not purchase. *See* Opp. at 7-8 ("As to those 27 other flavors, she might as well sue Ben & Jerry's over a puddle in which she *didn't* slip and fall").  The *Kashi* court explained:

Defendant's argument that Plaintiff Larsen can only represent purchasers of the exact same products, rather than similar products with the same alleged misrepresentations, is likewise unavailing. *See Anderson v. Jamba Juice Co.*, 888 F.Supp.2d 1000, 1006 (N.D.Cal. 2012) (holding purchaser of certain smoothie kits had standing as to purchasers of other kits because they contained same alleged misrepresentation).

291 F.R.D. at 502.  Ignoring *Kashi* and *Jamba Juice* on this point, B&J instead relies on *Major v. Ocean Spray Cranberries, Inc.*, 2013 WL 2558125 (N.D.Cal. June 10, 2013).  Opp. at 7-8.  However, the plaintiff there failed to link any product that she purchased to the challenged improper labeling. *Id.* at *4.  She bought a blueberry drink product and relied on labeling claims pertaining to blueberries, yet sought to represent a class of purchasers of products that did not include blueberries or claims about blueberries. *Id.* Here, each product purchased by every class member was labeled "All Natural" yet contained cocoa alkalized with a synthetic or artificial chemical.

Unlike *Ocean Spray*, *Dreyer's* is on point.  Denying the defendant ice cream maker's motion to dismiss in an "all natural" case that, unlike here, involved multiple synthetic ingredients, the court ruled that the plaintiff had standing as to ice cream flavors she did not purchase:

That the different ice creams may ultimately have different ingredients is not dispositive as Plaintiffs are challenging the same basic mislabeling practice across different product flavors. Indeed, many of the ingredients are the same—i.e., 21 out of 59 ice creams contain propylene glycol monostearate;

43 out of 59 contain potassium carbonate; and all 59 appear to contain glycerin, mono and diglycerides, tetrasodium pyrophosphate and xanthan gum.... Therefore, the Court rejects [the defendant's] argument that claims based on ice cream products not purchased by Plaintiffs should be dismissed from the case.

2013 WL 5353043, at *13; *see also Dorfman v. Nutramax Laboratories, Inc.*, 2013 WL 5353043, at *7 (S.D.Cal. Sept. 23, 2013) (quoting *Dreyer's* with approval, and citing other cases to the same effect).

### C.   Plaintiff has Standing to Seek Injunctive Relief

Finally, B&J argues that Plaintiff lacks standing to seek injunctive relief because (1) she stated at her deposition that she had not bought ice cream since 2010; and (2) B&J no longer uses "All Natural" labeling.  Opp. at 8-9.  B&J relies on *Wright v. General Mills, Inc.*, 2009 WL 3247148, at *5 (S.D.Cal. Sept. 30, 2009), where the court dismissed the plaintiff's request for injunctive relief **with leave to amend** because the defendant had already removed the offending ingredient from its product and the complaint did not allege that the practice was likely to recur.  Plaintiff here allege in the Amended Complaint:

> Moreover, even once the "all natural" representation is removed from the labels, B&J is not presently enjoined from putting the "all natural" representation back on its labels at any time it so decides, even if its Ice Cream products still contain unnatural, synthetic ingredients. Accordingly, Plaintiff seeks declaratory and injunctive relief to ensure B&J has in fact removed any and all of the "all natural" representations from labels on its Ice Cream products still available for purchase, and to prevent B&J from making the "all natural" representation on its Ice Cream labels in the future as long as the Ice Cream products continue to use alkalized cocoa processed with a synthetic, unnatural substance

Dkt. #20 ¶ 4.  As for the fact that Plaintiff did not buy B&J Ice Cream between 2010 and her June 2013 deposition, this plainly does not establish that she will never again purchase such a product.

## V.   PLAINTIFF HAS SHOWN COMMONALITY AND PREDOMINANCE

### A.   The *Kashi* "Organic" Ruling is Inapposite Because the Federal Regulations that Control Here and that B&J has Violated Did Not Apply in *Kashi*

B&J's commonality and predominance argument is largely premised on a single aspect of the *Kashi* ruling that it otherwise scrupulously avoids. *Kashi* involved food products generally, not ice cream. The court there made a novel ruling – no other court has ever so concluded – with respect to synthetic or artificial ingredients that the FDA allows to be included in products certified as "organic." The *Kashi* court concluded that the plaintiffs there failed to show that class members would view the presence of a synthetic or artificial ingredient permitted in "organic" food to be inconsistent with an "all natural" representation. 291 F.R.D. at 508.

This case is different from *Kashi* because, unlike the labeling at issue there, B&J's "all natural" labeling indisputably violated controlling federal regulations that apply specifically to ice cream and to flavoring agents such as cocoa.  As Plaintiff established in her opening brief, FDA regulations mandate that if the characterizing flavor or a simulating flavor **in ice cream** is artificial, the label must identify the ice cream as either "artificially flavored" or "flavored" as specified in 21 C.F.R. § 135.110(f).  The regulation places an affirmative duty on the manufacturer to appropriately label the product if it contains any artificial flavor, and does not permit the characterizing flavor of ice cream to be called "natural" or "all natural" when it is not.  *Id*.  By failing to label its Ice Cream Products "artificially flavored" or "flavored" as required by the federal regulations, and instead labeling those Products as "All Natural," B&J violated a federal regulation applicable to ice cream that was not at issue in *Kashi*.

Furthermore, under 21 C.F.R. § 101.22(i), which applies to characterizing flavors generally (not just with regard to ice cream), if a food contains *any* artificial flavor that simulates, resembles, or reinforces the characterizing flavor, the food must be labeled "artificially flavored."  *See Dreyer's,* 2012 WL 2990766, at *6 (citing FDA advisory opinion to this effect).  As Plaintiff discussed at length in her opening brief, and as B&J studiously ignores, Judge Chen in *Dreyer's* carefully parsed these regulations and the clear standard they embody with respect to ice cream labeled "all natural" that includes alkalized cocoa processed with synthetic potassium carbonate.  *See* Dkt #115 at 9-10 (analyzing *Dreyer's*).  The *Dreyer's* analysis applies here with full force: given the controlling federal regulations, a reasonable consumer simply would not expect an ice cream maker that labels its product "all natural" to use an artificial or synthetic alkalizing agent, particularly where an alkalizing agent that is not artificial or synthetic is commonly available.  *Dreyer's,* 2012 WL 2990766, at *11 (rejecting ice cream maker's argument that because potassium carbonate is commonly used as an alkalizing agent, a reasonable consumer would expect it to be used in ice cream labeled "all natural").

Because the ice cream and general flavor regulations did not apply in *Kashi*, that court's "organic" reasoning – even if it is presumed to be correct[2] – is inapplicable here.  Furthermore, B&J ignores that the

---

[2] Because the *Kashi* "organic" analysis is inapplicable here, Plaintiff will not dissect it in detail.  However, Plaintiff believes that the reasoning is subject to criticism.  Judge Huff believed that because consumers may equate "natural" with "organic," the fact that the FDA permits particular synthetic and artificial ingredients to be included in food products labeled "organic" means that a class member may not see the

1    *Kashi* court not only certified an entire "nothing artificial" class but also much of the "all natural" class as

2    well.  *Id.* at *15-16.

3         In a related point, B&J accuses Plaintiff of taking inconsistent positions about alkalized cocoa,

4    having first alleged that all alkalized cocoa is non-natural and later clarifying that only synthetic alkalis are

5    non-natural.  Opp. at 10.  In reality, Plaintiff clarified that B&J's alkalized cocoa was not natural because it

6    used undisclosed synthetic alkalis.  *See, e.g.,* Dkt. # 20, Amended Complaint at ¶ 2.  This clarification is

7    not inconsistent.  Moreover, the fact that the synthetic alkali was undisclosed is significant.  As Judge Chen

8    pointed out in *Dreyer's* in connection with knowledge about alkalizing agents, "a reasonable consumer

9    may not have the same knowledge as, *e.g.,* a commercial manufacturer."  2012 WL 2990766, at *11.

10        B&J also ambiguously claims that the FDA "disagrees that the term 'natural' is clear" (Opp. at 10),

11   but here the only ingredient at issue is an ice cream flavoring ingredient – alkalized cocoa.  As Judge Chen

12   explained in *Dreyers*, FDA regulations provide a clear definition of "natural flavor" and "artificial flavor"

13   that controls the labeling of ice cream.  *Dreyer's,* 2012 WL 2990766, at *4 ("Artificial flavor/flavoring and

14   natural flavor/flavoring are terms defined by regulation in 21 C.F.R. §101.22(a)(1) and (3).").

15        B&J relegates its discussion of the controlling regulations to the end of its brief.  Opp. at 20-22.

16   Completely ignoring Judge Chen's careful, on-point analysis in *Dreyer's* – the only case to have addressed

17   the issue – B&J falls back on a rehash of its other arguments.  B&J also argues that the percentage of alkali

18   as part of the total product weight is small.  Opp. at 21.   Regardless of the percentage, the fact remains that

19   the "all natural" claim was false – a low percentage does not render the "All Natural" claim true.  Nor does

20   the supposed chemical makeup of cocoa matter.  *See* Opp. at 21.   Federal regulations provide that the

21   alkalizing substance used in B&J Ice Cream Products – potassium carbonate – is a recognized synthetic

22   substance.  7 C.F.R. § 205.605(b).  The fact remains that B&J felt compelled to remove the "All Natural"

23   claim from its Ice Cream Products.  Its defense of that claim accordingly rings hollows.

24        B&J also complains that Plaintiff may not rely on the controlling regulations because this is an

25   "unpled claim" that Plaintiff did not allege in her December 8, 2010 Amended Complaint, Opp. at 22,

26

27   presence of an ingredient allowed in "organic" foods to be inconsistent with an "all natural" claim.  291
     F.R.D. at 508.   This ignores the distinction between "organic" and "all natural," and assumes that
28   consumers would accept synthetic ingredients in a product labeled "all natural."

1  which was filed eighteen months before Judge Chen issued *Dreyer's* on July 12, 2012.  Plaintiff's claims

2  are all brought under California law (Amended Complaint ¶¶ 34-70).  The federal regulations provide legal

3  support for those state law claims.  Moreover, following *Dreyer's*, Plaintiff put B&J on specific notice that

4  these federal regulations supported her claims in her answers to B&J's interrogatories.  *See* Dkt #132-2 at

5  8, 10.   While Plaintiff believes it would be a pointless exercise to amend to add this additional legal

6  support, she would be happy to do so if the Court would like.  B&J certainly has suffered no prejudice as a

7  result of Plaintiff's reliance on the regulations.

8        **B.        B&J's Litigation "Study" Does Not Advance Its Arguments**

9        In addition to relying on the inapposite aspect of *Kashi*, B&J also attempts to defeat commonality

10 by means of a survey of 400 consumers that it has just conducted which purportedly concludes that 13% of

11 those consumers would expect that a product labeled "all natural" containing alkalized cocoa would expect

12 the alkali would be natural.  *See* Opp. at 12.   However, B&J's study is statistically and procedurally

13 incompetent and unreliable to draw any conclusion about consumers in Plaintiff's proposed class.[3]  *See*

14 Kravec Dec, Ex. 2 (Rebuttal Report of Dr. Elizabeth Howlett ("Howlett Rebuttal") and Ex. 4 (Rebuttal

15 Report of Dr. Stephan Schneider ("Schneider Rebuttal").

16       As explained by Dr. Schneider, Dr. Van Liere's study is statistically unreliable because he only

17 sampled 116 total respondents from the relevant population, California, which is insufficient to draw any

18 conclusion about how California consumers view Ben & Jerry's "All Natural" labeling or whether they

19 expect that it contains alkalized cocoa processed with a non-natural substance.  Schneider Rebuttal, p. 4.

20       Even if Dr. Van Liere's study was statistically reliable, which it is not, it is also procedurally

21 unreliable.  Dr. Van Liere failed to account for any potential bias in respondents who were familiar with

22 B&J's well-known and famous brand, and the plethora of news articles announcing that B&J was removing

23 the "All Natural" statement from its labels amid criticisms that its ingredients were not natural.  Howlett

24 Rebuttal, ¶¶21-22, 26.  Moreover, Dr. Van Liere does not control for bias in those actually responding to

25 the survey to ensure that a representative sample of the relevant population was surveyed.  Schneider

26 Rebuttal at 5-6.

27 _____

28 [3] Drs. Schneider and Howlett provide numerous reasons why the Van Liere report and underlying study are invalid and irreparably flawed, Plaintiff simply highlights a few of the critical reasons below.

Additionally, Dr. Van Liere had serious flaws in his selection and interpretation between the test and control stimuli, rendering his conclusions unreliable. *Id.*, ¶¶ 20, 24, 34. Despite its flawed testing, Dr. Van Liere's study still showed that the vast majority of participants believed that the B&J products included cocoa processed with a natural alkali. *Id.*, ¶28.

### C.      Contrary to B&J's Claim, Reliance, Materiality, and Causation are Not "Inherently Individual"

B&J also claims that commonality is defeated because "reliance, materiality, and causation are inherently individual." Opp. at 12. However, relief under any of the UCL's three prongs is available "without individualized proof of deception, reliance and injury," so long as the named plaintiffs demonstrate injury and causation. *Kashi*, 291 F.R.D. at 504 (citing *Mass. Mut. Life Ins. Co. v. Super. Ct.*, 97 Cal.App.4th 1282, 1289, 119 Cal.Rptr.2d 190, 193 (Cal. Ct. App. 2002); *In re Tobacco II Cases*, 46 Cal.4th 298, 326–27 (Cal. 2009)). Likewise, under the CLRA, "[c]ausation, on a classwide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." *See Stearns*, 655 F.3d at 1021 (quoted in *Kashi*, 291 F.R.D. at 501).

Here, unlike the ingredients excluded from the certified Class in *Kashi*, the federal statutory and FDA regulatory provisions controlling the labeling of "natural" and "artificial" flavors on ice cream expressly demonstrate materiality to consumers. First, Congress mandated that "[a] food is misbranded – If it bears or contains any artificial flavoring, … unless it bears labeling stating that fact…" *Dreyers*, 2012 WL 2990766, * 4 (quoting 21 U.S.C. §343(k)). Second, §343(k)'s implementing regulation for ice cream requires the front of the label to conspicuously identify the flavor as "artificial", "artificially flavored", or "flavored." *Dreyers*, 2012 WL 2990766, *5 (quoting 21 C.F.R. §135.110(f)(2)). Third, the FDA's investigatory "Findings of Fact" that formed the basis of §135.110(f)(2) provide:

> Consumers quite generally prefer natural over artificial flavorings and desire to know when artificial flavorings are present in ice cream. To the extent that accurate information can be conveyed to consumers by labeling on ice cream, label statements of the use of artificial flavorings are in the consumer's interest. Label statements that comply with the requirements of the general provisions of the Federal Food, Drug, and Cosmetic Act are 'artificially flavored,' 'artificial flavoring added,' 'with added artificial flavoring' … (25 Fed. Reg. 7128, ¶19).

> The purpose sought to be served by prescribing the flavoring ingredients was the prevention of misleading labeling. It is concluded that a preferable way to achieve this purpose, and one

which will promote honesty and fair dealing in the interest of consumers, is to provide, in designating artificial flavoring for label declaration… (*Id.*, at ¶20).

These regulatory findings of fact that form the basis of §135.110(f)(2) create a strong evidentiary presumption in Plaintiff's and the Class' favor that the mislabeling of artificial flavors as "All Natural" on ice cream is material to consumers. *See Morgan v. U.S.*, 298 U.S. 468, 477 (1936) ("When the Secretary acts within the authority conferred by the statute, his findings of fact are conclusive."); *Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 185-86 (1935); *Rogge v. U.S.*, 128 F.2d 800, 803 (9th Cir. 1942).

In any event, Plaintiff presented ample common evidence from B&J, its parent Unilever and numerous independent marketing studies showing that consumers find "all natural" claims to be compelling, and a key driver of sales. *See* Dkt. #115 at 10:20-11:24. B&J does not directly address this substantial common evidence of materiality, but instead offers its own 2013 study done for this litigation and points to other studies which it contends shows a lack of materiality. Dkt. # 123-07 (Scott Report, pp. 17-27. As explained *supra*, B&J's 2013 study is seriously flawed and not credible. *See* §V.B, *supra*. But even if it were taken at face value as well as the other studies B&J points to, they amount to no more than some studies questioning materiality compared to the numerous studies Plaintiff submitted showing materiality. See Howlett Rebuttal, pp. 22-23. This hardly serves to extinguish Plaintiff's common evidence of materiality, but at most demonstrates competing common evidence and a predominant question of fact for the trier of fact to resolve.

## VI.   DAMAGES ISSUES DO NOT PRECLUDE CERTIFICATION

B&J goes on at length in an effort to convince the Court that "entitlement to monetary relief raises inherently individual issues." Opp. at 16-19. The Ninth Circuit put this argument to rest in *Leyva v. Medline Industries Inc.*, 716 F.3d 510 (9th Cir. 2013), reiterating that "'[i]n this circuit...damage calculations alone cannot defeat certification." *Id.* at 513-14. The court affirmed the long-standing principle that "'[t]he amount of damages is invariably an individual question and does not defeat class action treatment.'" *Id.* at 513-14 (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)). Significantly, the Ninth Circuit so ruled after the Supreme Court issued its recent damages ruling in *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (U.S. 2013).

In her opening submission, Plaintiff explained precisely how to calculate restitutionary

disgorgement of B&J's profits, to which class members would be entitled if they prevail.  *See* Dkt. #115 at 21-23 and record material cited therein.  B&J does not dispute that restitutionary disgorgement of profits can be calculated on a class-wide basis here.  B&J instead argues Plaintiff did not ask for restitutionary disgorgement in her Amended Complaint.  Opp. at fn. 8.  However, this is untrue as it is clearly plead in the "Prayer."  Dkt. # 20, p. 19 (seeking "Restitution in such amount that Plaintiff and all Class and Sub-Class members paid to purchase Ice Cream products, or the profits B&J obtained from those transactions").  Moreover, in certifying *Kashi*, Judge Huff approved very similar calculations, explaining that the plaintiff claimed the same type of economic injury and damages as putative class members.  As here, the plaintiff there alleged point-of-purchase loss and sought restitution in the form of a refund of all or part of the purchase price.  291 F.R.D. at 506.  Judge Huff emphasized that "[a] court awarding restitution under the California consumer protection laws has 'very broad' discretion to determine an appropriate remedy award as long as it is supported by the evidence and is consistent with the purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired."  *Id.* (citation omitted).

## VII.   PLAINTIFF IS TYPICAL

Plaintiff established typicality in her opening brief.  B&J's paragraph on typicality is a rehash of its other arguments, which are refuted above.

## VIII.   B&J HAS NOT REFUTED ADEQUACY

B&J makes just one objection as to adequacy, Plaintiff's settlement of the *Dreyer's* case discussed above.  Opp. at 23.  *Dreyer's* is a separate and distinct action involving a private settlement with a unique defendant, and the participation of the same named plaintiff and same counsel does not serve as a bar to class certification here.  In *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 105 F.R.D. 506, 509 (S.D. Ohio 1985), the defendants argued that the named plaintiffs could not show adequacy because the plaintiffs previously had settled individual claims against one of the defendants.  Rejecting this, the district court emphasized, "The Court encourages parties to settle their disputes if possible; we will not find such a settlement an impediment to certification of class claims against **other, independent defendants**."  *Id.* (emphasis added).  Moreover, although the named plaintiffs agreed not to disclose the terms of their settlement, the court found that this did not undermine the adequacy of representation as the plaintiffs did

1    not conceal the fact that a settlement had been reached.  *Id.*

2         Based on Ms. Astiana's previous filings describing the qualifications and experience of Class

3    Counsel, *see* Dkt. #115, at 16-17, the Court is well equipped to find that she and Class Counsel "will fairly

4    and adequately protect the interests of the class."  *See* Fed.R.Civ.P. 23(a)(4).

5    **IX.    B&J HAS NOT REFUTED SUPERIORITY**

6         B&J's superiority argument is particularly creative: because the Ice Cream Products stated

7    "satisfaction guaranteed or your money back," class action treatment is not superior.  Opp. at 24-25.  As

8    one court has pointed out, Fed.R.Civ.P. 23(b)(3) does not address superiority as a matter of abstract

9    economic choice analysis, but asks if a class action is "superior to other available methods for fairly and

10   efficiently adjudicating the controversy"— *i.e.*, other possible adjudication methods such as individual

11   lawsuits or a consolidated lawsuit.  *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, --- F.R.D.

12   ----, 2013 WL 1182733, at *11 (D.Me. Mar. 20, 2013) ("Hannaford may or may not have a good program

13   to satisfy aggrieved customers, but that the Hannaford program is not relevant to my superiority

14   determination under the class certification decision.").  Indeed, all four enumerated factors in this portion

15   of the Rule deal with adjudication. *See also* the language of the Advisory Committee note in the 1966

16   amendment that added this provision.  The Seventh Circuit recognized this language in holding that a

17   refund program cannot be considered a method of "adjudicating the controversy" under Fed.R.Civ.P.

18   23(b)(3). *In re Aqua Dots Prods. Liability Litig.*, 654 F.3d 748, 752 (7th Cir. 2011).

19   **X.    CONCLUSION**

20        For the reasons discussed herein and in Plaintiff's opening submission, Plaintiff respectfully

21   requests the Court certify this case as a class action, appoint her as Class Representative, and appoint Class

22   Counsel (*i.e.*, Joseph N. Kravec, Jr. of Feinstein Doyle Payne & Kravec, LLC, Michael D. Braun of the

23   Braun Law Group, P.C., and Janet Lindner Spielberg of the Law Offices of Janet Lindner Spielberg).

24

25   DATED:  October 30, 2013                          **FEINSTEIN DOYLE PAYNE**
                                                        **& KRAVEC, LLC**
26
                                                        By:   s/Joseph N. Kravec, Jr.
27                                                            Joseph N. Kravec, Jr.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Wyatt A. Lison
429 Forbes Avenue
Allegheny Building, 17th Floor
Pittsburgh, PA  15219
Phone:  (412) 281-8400
Fax:     (412) 281-1007
Email:  jkravec@fdpklaw.com
           wlison@fdpklaw.com

Michael D. Braun
**BRAUN LAW GROUP, P.C.**
10680 W. Pico Boulevard, Suite 280
Los Angeles, CA 90064
Phone:    (310) 836-6000
Fax:       (310) 836-6010
Email:  service@braunlawgroup.com

Janet Lindner Spielberg
**LAW OFFICES OF JANET
  LINDNER SPIELBERG**
12400 Wilshire Blvd., Suite 400
Los Angeles, CA 90025
Phone:    (310) 392-8801
Fax:       (310) 278-5938
Email:  jlspielberg@jlslp.com

*Attorneys for Plaintiff Skye Astiana*

1

**PROOF OF SERVICE**

2

STATE OF PENNSYLVANIA             )
                                  )    ss.:
3  COUNTY OF ALLEGHENY              )

4        I am employed in the County of Allegheny, State of Pennsylvania.  I am over the age of 18 and not
5  a party to the within action.  My business address is 429 Forbes Avenue, Allegheny Building, 17th Floor,
   Pittsburgh, PA  15219.
6
7        On October 30, 2013, using the Northern District of California's Electronic Case Filing System,
   with the ECF ID registered to Joseph N. Kravec, Jr., I filed and served the document(s) described as:

8            **PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND**
      **AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
9

10 **[X]      BY ELECTRONIC TRANSMISSION USING THE COURT'S ECF SYSTEM:** I    caused
11 the above document(s) to be transmitted by electronic mail to those ECF registered       parties  listed on
   the Notice of Electronic Filing (NEF) pursuant to Fed.R.Civ.P. 5(d)(1) and       by  first  class  mail  to
12 those non-ECF registered parties listed on the Notice of Electronic Filing  (NEF).  *"A Notice of Electronic*
13 *Filing (NEF) is generated automatically by the ECF        system upon completion of an electronic filing.*
   *The NEF, when e-mailed to the e-mail       address of      record in the case, shall constitute the proof of*
14 *service as required by        Fed.R.Civ.P. 5(d)(1).  A copy of the NEF shall be attached to any document*
   *served in the   traditional manner upon any  party appearing pro se."*

15
16       I declare that I am admitted *pro hac vice* in this action.

17       I declare under penalty of perjury under the laws of the United States that the above is true and
   correct.

18
19       Executed on October 30, 2013, at Pittsburgh, Pennsylvania.

20                                         s/Joseph N. Kravec, Jr.
21                                         Joseph N. Kravec, Jr.

22

23

24

25

26

27

28